ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

Kenneth J. Ward Jr.

        Plaintiff,

              -against-

THE CITY OF NEW YORK, a municipal entity;
NYPD DETECTIVE DIAQUOI; QUEENS COUNTY
DISTRICT ATTORNEY RICHARD BROWN;
DEPUTY BUREAU CHIEF FLOYD HERRING;
ASSISTANT DISTRICT ATTORNEYS JARED SCOTTO,
TAYLOR PISCIONERE, LEANN STAINES, ANGELA
HARPER; DEPUTY CLERK JOHN BARRY;
MAJOR GLEN LOWE; LIEUTENANTS DAWN O'BRIEN,
FRANK ROSSI;  COURT OFFICERS MARIE BENNETT,
JAMES CANNON, BERNADETTE FALCO,
JOHN VASQUEZ, KIMBERLY WILSON,
SALVATORE BRUNO, MIKE ESPOSITO,
RICH SUMOWSKI, KAHN; JOHN and JANE DOE #1-5;

        Defendants.

---------------------------------------------------------------------------X

:

:

:

:

:

:

**AMENDED VERIFIED
COMPLAINT**

No. 15-CV-04175 (CBA)(ST)

**JURY TRIAL DEMANDED**

RECEIVED
APR 17 2017
PRO SE OFFICE

       Plaintiff Kenneth J. Ward Jr., hereby brings this action under 42 U.S.C. § 1983 to redress his civil and legal rights, and alleges as follows:

### INTRODUCTION

1. This is a civil rights action in which the plaintiff, Kenneth J. Ward Jr. "Mr. Ward", seeks relief from the defendants violations of his rights secured by the Civil Rights Acts of 1871, Title 42 U.S.C. § 1983 and 1988, by the United States Constitution, including the First, Fourth, Fifth, Sixth and Fourteenth Amendment, and by the laws of the State of New York.

2. Plaintiff seeks compensatory and punitive damages, equity relief in the form of injunctive and declaratory relief, an award of costs, interest, legal and financial consulting fees, and such other and further relief as this Court deems just and proper.

3. This lawsuit seeks this Court's strong hand to finally put an end to the pervasive misconduct of the Queens District Attorney's Office ("QDAO"), the employees in Queens Civil Court and a detective from the NYPD.

4. This lawsuit seeks to hold the defendant City of New York liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and Monell v. Dept. Of Social Services, 436 U.S. 658 (1978). The unlawful actions of prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of criminal suspects and defendants, or from deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations.

5. As Plaintiff will demonstrate, during the prosecution of one of his criminal cases, the QDAO as a matter of policy, colluded with the complaining witness to suborn perjured testimony in the accusatory instrument in order to file a superseding information and then unlawfully concealed exculpatory or impeachment evidence known as "Brady" material, lied to and misled the court and criminal defendants in order to cover up for their unlawful behavior.

6. The Plaintiff will further demonstrate, that during the prosecution of his second criminal case, the QDAO as a matter of policy, colluded with and encouraged the complaining witness to stand by clearly perjured allegations, and facilitated and assisted a detective in the spoliation of evidence in order to cover up for their unlawful behavior.

7. In these two cases where such misconduct was exposed, these agencies took no disciplinary action against the offending employees thereby encouraging future constitutional violations to occur, including those directed against Plaintiff.

8. The principal individual involved during Plaintiff's first arrest, acting pursuant to unlawful municipal policy, who caused Plaintiff's unconstitutional prosecution and orchestrated the subsequent, 8-month cover-up of the District Attorney Richard Brown's Office misconduct is the present Deputy Bureau Chief Floyd Herring ("Herring"). Despite his position as Deputy Bureau Chief, which puts him in charge as an administrator in Criminal Court supervising assistant district attorneys and supervisors of assistant district attorneys, Herring engaged in a series of abuse of process in fraudulent and deceptive acts all caused by and consistent with his Office's unlawful policies, in order to prosecute Kenneth J. Ward Jr. Herring's unethical behavior in Wards' s case included the following:

> Suborned defendant BENNETT, five months after the Plaintiff's initial arrest, to commit perjury in the accusatory instrument in order to file a superseding information.

> Herring then unlawfully concealed exculpatory or impeachment evidence known as "Brady" material, and lied to or misled courts and criminal defendants in order to cover up the QDAO's unlawful behavior.

> Herring colluded with Queens Assistant District Attorneys ("QADA") to avoid a jury trial on Plaintiff and Leibovitz' charges by dismissing the top charge, thereby downgrading to a bench trial.

9. Richard Brown's overall deliberate indifference to the very types of constitutional violations that occur in his office[1], was a substantial factor that led to the misconduct of Deputy Bureau Chief Floyd Herring, Assistant District Attorneys Jared Scotto, Taylor Piscionere, LeAnn Staines and Angela Harper at Plaintiff, and thus exposes defendant CITY OF NEW YORK, for whom Brown was the chief policymaker in the management and administration of the QDAO, a City agency, to federal civil rights liability under Monell for Plaintiff's damages.

10. This lawsuit also seeks to hold personally accountable five New York State Court employees, Deputy Clerk John Barry, Major Glen Lowe, Lieutenant Frank Rossi, Lieutenant Dawn

---

[1] As Joel Rudin noted in his filing, in 70 known cases of prosecutorial mistakes and misbehavior in Queens over about a decade, the district attorney, Richard A. Brown, has disciplined just one lawyer, http://www.nytimes.com/2008/10/22/nyregion/22about.html

O'Brien and Court Officer Marie Bennett who acted in concert with Assistant District Attorneys in violating Plaintiff's constitutional rights and who are named as defendants in their individual as well as their official capacities.

11. Plaintiff seeks additional recovery and to hold personally accountable court officers who acted in concert with Glen Lowe, Frank Rossi, Dawn O'Brien, John Barry and Marie Bennett in violating Plaintiff's constitutional rights and are named as defendants in their individual as well as their official capacities.

12. Finally, this lawsuit also seeks to hold personally accountable Detective Diaquoi, who procured an I-card in the face of credible evidence that it was unjustified, and who also colluded with others to spoliate evidence, thereby denying Plaintiff a fair hearing and due process thus violating Plaintiff's constitutional rights. He is named as a defendant in his individual as well as in his official capacity.

13. Plaintiff, Kenneth Ward Jr., seeks $25 million in actual damages, and $25 million in punitive damages, for the misconduct that deprived him of the joys of living as a free person.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to the First, Fourth, Fifth, Sixth and Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. §1983, §1988 and under the common law of the State of New York.

15. Jurisdiction is conferred on this Court under 28 U.S.C. §§ 1331 and 1343(a), and under 28 U.S.C. § 1367, which provides for supplemental jurisdiction over claims which arise under New York state law.

16. In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the Constitution of the United States.

17. Venue is proper under 18 U.S.C. § 1391(b) and (c) in that Defendant CITY OF NEW YORK is administratively located within the Eastern District of New York, and the events giving rise to this claim occurred within the boundaries of the Eastern District of New York.

18. Declaratory relief is available pursuant to 28 U.S.C. §§2201 and 2202.

## JURY TRIAL DEMANDED

19. Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## PARTIES

20. At all times relevant to this action, Plaintiff Kenneth J. Ward Jr ("Mr. Ward") was a resident of Queens, County, New York. He is currently a resident of Queens County, New York.

21. Defendant The City of New York ("CITY") is a municipality organized and existing under the laws of the State of New York. At all relevant times, the CITY, acting through the Queens County District Attorney's Office was responsible for the policy, practice, supervision, implementation, and conduct of the Queens County District Attorney's Office and was responsible for the appointment, training, supervision, and conduct of all the Queens County District Attorney's Office, including the defendants named in this complaint. In addition, at all relevant times, the CITY was responsible for enforcing the Queens County

District Attorney's Office, and for ensuring that the Queens County District Attorney's Office obey the laws of the United States and the State of New York. Service on Defendant CITY can be effectuated at 100 Church Street, New York, NY 10007, 4th floor.

22. Defendant CITY is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of detectives. Defendant CITY was at all times relevant herein the public employer of Defendant NYPD Detective Carl Diaquoi.

23. At all relevant times, Defendant Richard Brown ("BROWN"), was the District Attorney for the Queens County District Attorney's Office. At all relevant times, Defendant BROWN acted in his capacity as agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant BROWN can be effectuated at his main office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

24. At all relevant times, Defendant Floyd D. Herring ("HERRING"), was the Deputy Bureau Chief, administrator in Criminal Court, supervising assistant district attorneys and supervisors of assistant district attorneys. At all relevant times, Defendant HERRING acted in his capacity as agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant HERRING can be effectuated at his main office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

25. At all relevant times, Defendant Jared Scotto ("SCOTTO"), was an assistant district attorney for the Queens County District Attorney's Office. At all relevant times, Defendant SCOTTO

acted in his capacity as agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant SCOTTO can be effectuated at his office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

26. At all relevant times, Defendant Taylor Piscionere ("PISCIONERE"), was an assistant district attorney for the Queens County District Attorney's Office. At all relevant times, Defendant PISCIONERE acted in her capacity as agent, servant, and employee of Defendant CITY, within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant PISCIONERE can be effectuated at her office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

27. At all relevant times, Defendant LeAnn Staines ("STAINES"), was an assistant district attorney for the Queens County District Attorney's Office. At all relevant times, Defendant STAINES acted in her capacity as agent, servant, and employee of Defendant CITY, within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant STAINES can be effectuated at her office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

28. At all relevant times, Defendant Angela Harper ("HARPER"), was an assistant district attorney for the Queens County District Attorney's Office. At all relevant times, Defendant HARPER acted in her capacity as agent, servant, and employee of Defendant CITY, within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant HARPER can be effectuated at her office located on 125-01 Queens Boulevard Kew Gardens, New York 11415.

29. At all relevant times, Defendant Carl Diaquoi ("DIAQUOI") was a detective for the New York City Police Department, a municipal agency of Defendant CITY OF NEW YORK. At all relevant times, defendant Diaquoi acted in the capacity as agent, servant, and employee of defendant City and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant DIAQUOI can be effectuated at the 104 precinct located at 64-2 Catalpa Ave., Queens, NY, 11385.

30. At all relevant times, Defendant John Barry ("BARRY") was the deputy clerk of the county, Queens Civil Court , acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant BARRY can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

31. At all relevant times, Defendant Glen Lowe ("LOWE") was a major in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant LOWE can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

32. At all relevant times, Defendant Frank Rossi ("ROSSI") was a lieutenant in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant ROSSI can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

33. At all relevant times, Defendant Dawn O'Brien ("O'BRIEN") was a lieutenant in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant O'BRIEN can be effectuated at her office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

34. At all relevant times, Defendant Marie Bennett ("BENNETT") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant BENNETT can be effectuated at her office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

35. At all relevant times, Defendant James Cannon ("CANNON") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant CANNON can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

36. At all relevant times, Defendant Mike Esposito ("ESPOSITO") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant ESPOSITO can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

37. At all relevant times, Defendant John Vasquez ("VASQUEZ") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant VASQUEZ can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

38. At all relevant times, Defendant Rich Sumowski ("SUMOWSKI") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant SUMOWSKI can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

39. At all relevant times, Defendant Kahn ("KAHN") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Service on Defendant KAHN can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

40. At all relevant times, Defendant Bernadette Falco ("FALCO") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Service on Defendant FALCO can be effectuated at her office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

41. At all relevant times, Defendant Kimberly Wilson ("WILSON") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity.  Service on Defendant WILSON can be effectuated at her office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

42. At all relevant times, Defendant Salvatore Bruno ("BRUNO") was a court officer in Queens Civil Court, acting in the capacity as agent, servant, and employee of New York State and within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond her scope. He is sued in his individual and official capacity.  Service on Defendant BRUNO can be effectuated at his office located on 89-17 Sutphin Blvd. Jamaica, NY 11435.

43. At all relevant times, Defendants "John and Jane Doe #1-5" ("John and Jane Doe #1-5") were court officers in Queens Civil Court acting in the capacity as agent, servant, and employee of New York State and within the scope of their employment as such, and under color of state law except when alleged herein that they acted beyond their scope.  Jane Doe #1 is an unidentified lieutenant with the following features: blond, female approximately 6'0 160 pounds. They are sued in their individual and official capacity.  Plaintiff is unable to determine the complete name of the court officers at this time and thus is suing them under a fictitious designation.

44. At all times relevant herein, Defendants O'BRIEN, CANNON, ESPOSITO, VASQUEZ, SUMOWSKI, KAHN, FALCO, WILSON, BRUNO, John and Jane Doe #1-5 , were employed by the State and are referred to collectively herein as the "State Defendants".

45. Plaintiff reserves the right to amend this Complaint after discovery reveals the true names of John and Jane Doe #1-5.

46. All actions by Defendants, their officers, employees, or agents, described herein are taken under color of state law.

## NOTICE OF CLAIM

47. Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York, setting forth the facts underlying Plaintiff's claim against Queens County District Attorney Richard Brown, Deputy Bureau Chief Floyd Herring, Assistant District Attorneys Jared Scotto, Taylor Piscionere, LeAnn Staines and Angela Harper and NYPD Detective Carl Diaquoi.

48. The CITY assigned a claim number to Plaintiff's claim, and Plaintiff was subjected to an examination pursuant to N.Y Gen. Mun. L. Sec. 50-h.

49. Pursuant to New York General Municipal Law § 50-e et seq., at least 30 days have elapsed since the service of notices of claim, and to date, no answer has been received by Plaintiff and no compensation has been offered by Defendant CITY in response to this claim.

50. This action has been commenced within one year and ninety days of the date of occurrence of the events giving rise to this Complaint.

## STATEMENT OF FACTS

51. Sometime in May of 2013, Mr. Ward decided that he needed to empower himself by learning some law in order to continue to prosecute his petition for annulment, docket number 16944/2011, against his wife Teresa Rodriguez, a/k/a Teresa Ward ("Teresa Ward") and to defend himself against Teresa Ward and his siblings.

52. Beginning in 2008, Teresa Ward had Mr. Ward arrested approximately 8-10 times.

53. Lacking knowledge of the law, Mr. Ward took his lawyers' legal advice and pled to an adjournment in contemplation of dismissal ("ACD").

54. In 2004, Mr. Ward discovered that his siblings were stealing money from his father and mother's estate.

55. Mr. Ward further discovered that his father and mother's benefits were being misappropriated and illegally distributed by union representatives.

56. With his funds running low, Mr. Ward could no longer afford an attorney.

57. In early May, 2013, Mr. Ward decided to head to the Queens Supreme Court Law library.

58. Upon entering the law library, Mr. Ward approached Denise, one of the law librarians, and asked her for some assistance and guidance.

59. During that time, Etan Leibovitz ("Leibovitz") was seated by the computer, adjacent to Denise's desk, working on some legal documents.

60. From where Leibovitz was seated, he was able to overhear Mr. Ward's discussion with Denise and volunteered to provide Mr. Ward a helping hand.

61. Leibovitz showed Mr. Ward around the law library and then took him downstairs to the clerk's office to show Mr. Ward where he can file his documents and view his docket.

62. While heading back upstairs, Mr. Ward further informed Leibovitz about his current predicament.

63. Mr. Ward notified Leibovitz that Teresa Ward was currently residing in his house located at 83-13 Myrtle Avenue, Glendale New York 11385 (hereinafter "property") and is trying to steal his property and assets.

64. Sometime in 2007, Teresa Ward started making false accusations of domestic violence against Mr. Ward in order to have him forcefully removed from the property.

65. Prior to his removal, Mr. Ward made sure his mortgage payments were made on time even going as far as making an extra payment every month.

66. On or about 2006, Teresa Ward started learning how to file applications for loan modification for her clients at work.

67. In 2010, Teresa Ward started paying Mr. Ward's $30,000 a year mortgage by making payments using checks in her maiden name.

68. On or about June 5th, 2012, Teresa Ward stopped making mortgage payments and started keeping the rental income, in excess of $2200.00 a month.

69. In 2013, Chase Manhattan National initiated a foreclosure proceeding in Queens Supreme Court, docket number 15208/2013, against Mr. Ward.

70. Mr. Ward further notified Leibovitz that he has 8-10 court orders from judges that allow him to go over to his property to maintain the premise and pick up the rental income in order to pay the mortgage which is under his name.

71. Every time Mr. Ward made an attempt to collect the rental income, Teresa Ward would have him arrested.

72. Mr. Ward's arrests started once the restrictions from the green card that Mr. Ward got for Teresa Ward and her daughter were lifted in 2008.

73. As a result of all of these arrests, Mr. Ward was unable to find meaningful work.

74. Prior to meeting Teresa Ward, Mr. Ward was never accused of any violent crimes or abuse.

75. For over 25 years, Mr. Ward worked as an engineer while volunteering for a church on weekends and attending college at night.

76. Back in 2012, Leibovitz made a promise, one of his bucket lists, that if he ever met someone in a position like Mr. Ward he would help them out.

77. Sometime in 2012, Leibovitz became a full time activist applying the theory that he couldn't help himself with his legal matters unless he helped someone out first.

78. Leibovitz adopted this philosophy as a result of his experience with his prior business partners.

79. By the end of their conversation, if all of Mr. Ward's allegations were true, Leibovitz couldn't stand idly and allow this miscarriage of justice to continue.

80. Leibovitz informed Mr. Ward that if he ever needed help to inform him especially effectuating service.

81. Sometime in May 2013, Judge Lenora Gerald allowed Mr. Ward's attorney Steven Bilosi to be relieved from Mr. Ward's annulment case.

82. Mr. Ward was left with no other choice but to represent himself pro se.

83. Sometime in the end of March 2014, Mr. Ward had enough and decided to take legal action to preserve his property.

84. Mr. Ward notified Leibovitz that he wants to file a petition for nonpayment against Teresa Ward as a result of Teresa Ward failing to continue to make mortgage payments in accordance to DRL § 236 automatic orders (owing approximately $250,000) to Mr. Ward's property.

## April 3rd, 2014

85. On April 3rd, 2014, Mr. Ward placed a call to Leibovitz and inquired if Leibovitz can serve Teresa Ward with the petition for nonpayment.

86. All of Mr. Ward's friends declined to serve Teresa Ward for fear of getting arrested.

87. Teresa Ward has a long-standing history of twisting facts for her own purposes in order to paint the narrative that she wants the authorities to believe.

88. Mr. Ward knew that he could count on Leibovitz.

89. Leibovitz wasn't afraid of getting arrested in order to bring the truth to light.

90. Leibovitz always carried with him his cell phone in order to produce objective evidence when effectuating service.

91. On April 3rd, 2014, at approximately 5:10 pm, Mr. Ward picked up Leibovitz at his residence and drove over to his property, making a right turn onto Myrtle Avenue from Woodhaven Blvd heading west.

92. At around 5:35 pm, Mr. Ward made a U-turn and parked his minivan on 85th St. and Myrtle Avenue, on the south east corner, right near the bus stop, approximately 1000 feet away from his property.

93. Upon arrival, Leibovitz got out of the minivan with Mr. Ward's petition and his cell phone by his side and approached the property.

94. Upon arrival to the property, Leibovitz knocked on the front door and a male voice answered.

95. Leibovitz asked if Teresa Ward was there.

96. The male "tenant" responded no.

97. Leibovitz turned around and started heading back to the minivan where Mr. Ward was parked.

98. As Leibovitz entered the minivan, Mr. Ward took a glimpse at his side mirror and said, "Teresa Ward just got out of the house, she's on the lawn".

99. Leibovitz exited the minivan with his cell phone and petition in hand and approached the property.

100. Upon arrival to the property, Leibovitz informed Teresa Ward that she was being served with a notice of petition.

101. Teresa Ward said she doesn't want to deal with this and that she was going to call the cops.

102. Leibovitz informed Teresa Ward that he has a legal right to serve her pursuant to CPLR 308.

103. Teresa Ward was unhappy and refused service.

104. At approximately 5:57 pm, Leibovitz dropped the petition by Teresa Ward and took several photos to document service.

105. Upon completion of service, Leibovitz turned around and started walking back to Mr. Ward's minivan.

106. Leibovitz crossed to the south side of Myrtle Avenue and started  heading back east.

107. As Leibovitz was walking back towards the minivan, Teresa Ward started "running" towards the minivan.

108. Teresa Ward used the northern sidewalk of Myrtle Avenue and headed east.

109. When Teresa Ward arrived, she was aligned directly across the street from Mr. Ward, who was at all times in his minivan.

110. Teresa Ward pointed her phone in Mr. Ward's direction and stated in part, "I got you now".

111. Leibovitz arrived a couple seconds later and entered the minivan.

112. Teresa Ward then started heading back to the property.

113. While in the minivan, Mr. Ward stated, "She is probably going to be up to something."

114. Mr. Ward drove away heading east on Myrtle Avenue in order to get outside the jurisdiction of the 104th Precinct.

115. Mr. Ward made a left turn onto Woodhaven Blvd and then a right turn onto Metropolitan Avenue.

116. While making his right turn, Mr. Ward immediately parked his minivan on the sidewalk across the street from the restaurant Wendy's.

117. Mr. Ward was now inside the jurisdiction of the 112 precinct.

118. At approximately 6:03 pm, Mr. Ward placed a call to 911.

119. After several telephone calls, and an attempt by the 104th Precinct to get involved, it was finally established that this was within the purview of the 112th.

120. At approximately 6:36 pm, two officers from the 112 Precinct arrived.

121. Upon arrival, Mr. Ward informed the two police officers what transpired when Leibovitz effectuated service on Teresa Ward. This was recorded and a police report was filed.

**Defendant DIAQUOI**

122. On April 7th, 2014, Defendant DIAQUOI placed a call with Mr. Ward leaving him a message on his voicemail.

123. On April 8th, 2014 at approximately 12:13 pm, Mr. Ward placed a call to Defendant DIAQUOI.

124. The following colloquy ensued between Mr. Ward and Defendant DIAQUOI:

| | |
|---|---|
| Mr. Ward: | Hi Detective you called me yesterday. |
| Defendant DIAQUOI: | Who is this? |
| Mr. Ward: | This is Kenneth Ward. |
| Defendant DIAQUOI: | What's going on Kenneth? |
| Mr. Ward: | I am sorry. |
| Defendant DIAQUOI: | What's going on? |
| Mr. Ward: | I don't know you called me. |
| Defendant DIAQUOI: | Well you made a report against your wife, right? |
| Mr. Ward: | Yes I did. |
| Defendant DIAQUOI: | That is why I am calling you for. |
| Mr. Ward: | Okay |
| Defendant DIAQUOI: | Tell me what's going on, what happened, actually your wife is here right now with me. She is getting arrested right now. |
| Mr. Ward: | Okay. |
| Defendant DIAQUOI: | Alight, she made a report against you too, you know that right? |
| Mr. Ward: | Yeah I do know that, yes. |
| Defendant DIAQUOI: | Yes so she is being arrested and you are going to be arrested also. |
| Mr. Ward: | What am I going to be arrested for? |
| Defendant DIAQUOI: | For violation of the order of protection. Both of you guys are going to be, it's going to be both complaint, she made a report you made a report. |
| Mr. Ward: | I didn't violate any, any order of protection number 1, number 2 if I am arrested I am going to be suing the Police Department and everybody else. |
| Defendant DIAQUOI: | Listen to me, you could sue whoever you want to sue, you are going to be arrested, I am telling you right now. |
| Mr. Ward: | Well I am explaining to you sir, I didn't violate an order protection I have a witness to that. |
| Defendant DIAQUOI: | Alight, I know you have a witness she showed me pictures so can you |

> tell me what happened that day?
>
> Mr. Ward: I was approximately 1000 feet or 1000 to 2000 feet away from my property, when a server took legal papers and went to serve her. I was no where near the house or anywhere near her. After the server served her she threatened him and then she ran down the block towards my car like you know intimidating me and scaring me.
>
> Defendant DIAQUOI: Did she say anything to you?
>
> Mr. Ward: I don't, I think she said something like I gotcha.you or something.
>
> Defendant DIAQUOI: I gotcha yeah, okay.  Well, she told me that you came inside the house.
>
> Mr. Ward: That is not true at all.
>
> Defendant DIAQUOI: Listen to me,  I wasn't there so I don't know .......

**Call gets disconnected**

125. At approximately 12:16 pm, Mr. Ward placed a call to Defendant DIAQUOI and their discussion resumed. The following colloquy ensued:

> Mr. Ward: Yeah sorry about that Detective.
>
> Defendant DIAQUOI: That's alright.
>
> Mr. Ward: The phone dropped.
>
> Defendant DIAQUOI: So it's going to be your word against her word, do you understand what I am saying? That is what I am trying to tell you. She is going to be arrested. I am telling you now. She is being arrested right now and you are going to be arrested also.  So you could sue whoever you sue, you could call whoever you want to call. I am telling you right now you are going to be arrested. I am going to put a I-card against you or wanted card so if get stopped by the cops you will be arrested by the cops.
>
> Mr. Ward: Well there is no probable cause and I have the witness right here with me so you can speak to him.
>
> Defendant DIAQUOI: I don't need to speak to anybody. I am telling you...
>
> Leibovitz: Detective, detective, detective, detective we have photos. I went to serve, Ms. Ward, Mr. Ward never stepped out of the car.
>
> Defendant DIAQUOI: Listen to me she..
>
> Leibovitz: Alright listen, You are getting information right now and if you arrest him we will, you will be sued. Okay so do what you need to do. Alright.
>
> Defendant DIAQUOI: Listen to me it's not the first time I am being sued.

| | |
|---|---|
| Leibovitz: | Alright that's awesome!! So do your job. Listen… |
| Defendant DIAQUOI: | You got to get on line for me to be sued. I am telling you are going to be arrested. |
| Leibovitz: | Alright awesome…alright just wait for a lawsuit because we will put it together against you, you are messing around with the wrong people. Thank you… |
| Defendant DIAQUOI: | You are not going to be the only one. |

### Leibovitz to Ward speak to him

| | |
|---|---|
| Mr. Ward: | Well detective here is the situation I have the proof I didn't go near. |
| Defendant DIAQUOI: | A lot of people sue me so it will be hard to sue me also. |
| Mr. Ward: | Excuse me, excuse me, first of all I have orders from the judge okay, stating that I am allowed to go to my property and manage my property and collect the rent , I didn't go near there okay, I didn't go near the house. I didn't go anywhere near there. |
| Defendant DIAQUOI: | Listen to me I understand what you are saying but that is not what she is saying. She is saying something you saying something, I don't know who is telling the truth |
| Mr. Ward: | Okay so then ….. |
| Defendant DIAQUOI: | So I am arresting…. |
| Mr. Ward: | So when I said something that last three times why wasn't she arrested? Because no one is doing their job. And I told the captain we were going to file an Article 78 |
| Defendant DIAQUOI: | She is getting arrested now, she is getting arrested right now…. |
| Mr. Ward: | Well….Right after I told the captain that we are going to put an Article 78 because you didn't do your jobs in the first place. |
| Defendant DIAQUOI: | Listen to me, listen to me I don't wear a uniform I don't understand what you are saying, I am a detective ….. |
| Mr. Ward: | What time does she allege this happen? What time did she…What time did she allege that I went into the house? |
| Defendant DIAQUOI: | Excuse me? |
| Mr. Ward: | What time did she allege that I went into the house? |
| Defendant DIAQUOI: | Alright, alright…Listen to me you already told me what happened alright she told me what happened, so there is no need to for me to talk to you no more. Alright… |
| Mr. Ward: | So what time did she allege that I went into the house? |
| Defendant DIAQUOI: | Till next time alright… |
| Mr. Ward: | Excuse me |
| Defendant DIAQUOI: | Alright sir, thank you very much. |

Mr. Ward:      Ok I am recording this you do understand that.

**Defendant DIAQUOI hangs up**

126.    At approximately 12:47 pm, Mr. Ward placed another call to Defendant DIAQUOI and their discussion resumed. The following colloquy ensues:

Mr. Ward:   I am just curious to know what time the alleged, the … Teresa alleged that I went into the house.

Defendant DIAQUOI:   Give me one second ……..   She made a report, the report stated that from 6:15 to 7 o'clock so between 6:15 to 7 o'clock.

Mr. Ward:   That I did what?

Defendant DIAQUOI:   That you were trying to serve her papers and that you went inside the house, I don't know, doesn't give you what time that you actually went inside the house. It just says the incident happened between 6:15 to 7 o'clock.

Mr. Ward:   Okay so now do you want to see pictures of the server actually serving her that didn't go into the house?

Defendant DIAQUOI:   I seen pictures. She got pictures of the server outside.

Mr. Ward:   Right, So that's not me. So what are you talking about?

Defendant DIAQUOI:   I know it's not you, but I am saying that she said, she stated that  you went inside the house. It is not me saying that. Listen I wasn't there.

Mr. Ward:   It doesn't matter … I have a witness that states that I wasn't near the house.

Defendant DIAQUOI:   You never let me talk.  Let me talk for a second.

Mr. Ward:    Go ahead.

Defendant DIAQUOI:   I am going to explain to you…I wasn't there….I don't know what happened. You made a report she made a report. Do you understand what I am saying? She said you went inside the house you violated the order of protection and you were screaming at her. Alright….You said in the report saying that she went to your car and she was screaming at you. Alright….

Mr. Ward:   No I didn't state that. I didn't state that at all. Okay. I said she seen my car down the block and she ran after me.

Defendant DIAQUOI:   And she ran after you and she was screaming at you didn't you just told me that before.

Mr. Ward:   I was in the car. I didn't say she was screaming at me. I did not make that comment at all.

Defendant DIAQUOI:   Really?

22

| Mr. Ward: | Yes. I stated that she made a comment like I got you. But I didn't say she was screaming at me, and I was always in the car. I never left the car. |
| Defendant DIAQUOI: | Okay so she came to the car and said I got you. |
| Mr. Ward: | Yup and she was taking pictures of me at the car. |
| Defendant DIAQUOI: | Alright that's fine alright…anything else you want to know? |
| Mr. Ward: | Yeah,  the car was 2 more than 2000 feet away from my house. |
| Defendant DIAQUOI: | Oh my god there you go again. |
| Mr. Ward: | It's true and I have documentation from the judge not only precluding her but stating that I am allowed to go to my separate resident, manage my separate resident and collect the rent. |
| Defendant DIAQUOI: | Okay why don't you bring that piece of paper to me?. |
| Mr. Ward: | Better yet why don't you give me a fax and I'll send it to you. |
| Defendant DIAQUOI: | Huh? |
| Mr. Ward: | Why don't you give a fax number and I'll fax it to you. |
| Defendant DIAQUOI: | Why you can't bring it to me? |
| Mr. Ward: | Because I am not in town right now. |
| Defendant DIAQUOI: | You are out of town? |
| Mr. Ward: | Yeah |
| Defendant DIAQUOI: | When you get back you show it to me. |
| Mr. Ward: | Yeah okay…Why so you can arrest me? |
| Defendant DIAQUOI: | You are going to be arrested no matter what. |

**Assistant District Attorney Angela Harper**

127.  On April 8th, 2014, at approximately 3:38 pm, Mr. Ward decided to return Defendant HARPER's call from the day before.

128.  During their discussion, Defendant HARPER informed Mr. Ward that the reason for her call was to inform him that she was in the process of writing up the case against Teresa Ward for her violation of the order of protection that he has against her.

129.  Defendant HARPER further informed Mr. Ward that in order to move forward with the case he would need to sign an affidavit stating that all the statements he made to the police were true.

130.   At approximately 4:12 pm, Defendant HARPER emailed Mr. Ward the corroborating affidavit, requesting that he sign it and send it back to her either by email or fax.

131.   The following day at approximately 12:04 pm, Mr. Ward emailed Defendant HARPER informing her that he has attached the corroborating affidavit that he had rewritten.

132.   Mr. Ward further informed Defendant HARPER that if her office wants to adopt his corroborating affidavit only then he would sign off on it.

133.   Defendant HARPER responded to Mr. Ward by emailing him back at 2:58 pm  stating in part:

> " I have forwarded this to the ADA that will be assigned to your
> case. We will still need you to sign the corrob (sic) that I sent
> but we will add this to your file"

134.   At 3:27 pm, Mr. Ward emailed Defendant HARPER informing her that the report submitted by the officer did not accurately reflect what he presented in his complaint.

135.   Mr. Ward eventually declined to sign the corroborating affidavit.

136.   Unlike Teresa Ward, Mr. Ward wasn't going to sign a false report and commit perjury.


**The April 16th, 2014 Incident**

137.   On April 16th, 2014, Mr. Ward had a court hearing scheduled in Queens Civil Court (docket # 059224/14) for 9:30 a.m. with regards to his notice of petition for nonpayment against Teresa Ward.

138.   That same morning, Leibovitz headed to the Queens Central Library to work on some of his legal documents.

139.    At approximately 8:45 a.m., Mr. Ward made an appearance as the petitioner in Queens Civil Court located on Sutphin Boulevard against respondent Teresa Ward.

140.    That morning, Mr. Ward entered Queens Civil Court and proceeded to go upstairs to room 406D to check the court calendar.

141.    When the courtroom was first opened, Mr. Ward entered and sat down by the farthest wall to the left and patiently waited.

142.    Mr. Ward was the first one to arrive.

143.    A few minutes later, Teresa Ward entered the courtroom and walked over directly towards Defendant BENNETT.

144.    From where Mr. Ward was sitting, he overheard Teresa Ward informing Defendant BENNETT that she has an order of protection against him.

145.    Teresa Ward intentionally failed to mention to Defendant BENNETT that Mr. Ward has an order of protection against her as well.

146.    When Teresa Ward sat down, Mr. Ward got up and approached Defendant BENNETT.

147.    Mr. Ward explained to Defendant BENNETT that he has an order of protection against Teresa Ward as well.

148.    Defendant BENNETT stated okay and instructed Mr. Ward to sit back down where he was originally sitting.

149.    The presiding judge, Judge Landson, called Mr. Ward's case and both Mr. Ward and Teresa Ward approached the bench.

150.    Despite the fact that she is sufficiently fluent in English to work as a translator, Teresa Ward asked the Judge to appoint both an attorney and an interpreter.

151.    Teresa Ward works at the Child Center of New York where she translates English into Spanish for her employer.

152.   Teresa Ward's deceptive behavior made Mr. Ward feel very uncomfortable.

153.   As a result of Teresa Ward's application, Judge Landson adjourned the hearing for a second call.

154.   At 9:31 and 9:37 am, Mr. Ward placed two calls to Leibovitz expressing his concern that Teresa Ward was acting in such a deceptive manner.

155.   During their conversation, Mr. Ward asked Leibovitz if he could come to court to be a witness.

156.   Leibovitz stated for Mr. Ward not to worry and that he would be there.

157.   At approximately 9:49 a.m. , Judge Landson called Mr. Ward's case back on the record.

158.   Upon the conclusion of the hearing, Mr. Ward asked Judge Landson where he could order the minutes.

159.   Judge Landson instructed Mr. Ward that he could go to the clerk's office, which was located on the third floor, to order the minutes.

160.   After Judge Landson adjourned Mr. Ward's case, Mr. Ward was ready to walk out and order the minutes.

161.   Teresa Ward was allowed to exit the courtroom first.

162.   Defendant BENNETT stopped Mr. Ward and asked him if he had any other business to attend while in the courthouse.

163.   Mr. Ward stated yes and informed Defendant BENNETT that he needs to go downstairs to the third floor to order the minutes.

164.   Defendant BENNETT instructed Mr. Ward to sit down.

165.    Mr. Ward reasonably asked why and Defendant BENNETT stated, "Because you're a man and she's a woman."

166.    Mr. Ward felt intimidated.by this statement that was a clear example of sexual bias.

167.    It took Leibovitz approximately 20 minutes to arrive to the courthouse.

168.    At approximately 9:56 and 9:57 am, Leibovitz placed a call to Mr. Ward informing him that he arrived at the Queens Civil Court.

## Leibovitz's Arrival

169.    At approximately 9:58 a.m., Leibovitz arrived on the 4th floor and started walking in the direction to Room 406D.

170.    As Leibovitz was walking in the direction towards Room 406D, Teresa Ward was walking in the opposite direction.

171.    When Leibovitz walked by Teresa Ward, she yelled at him stating "asshole".

172.    At approximately 10:00 a.m., Leibovitz quietly entered room 406D and looked for Mr. Ward, who was seated to the left.

173.    Leibovitz walked approximately 10 feet, made a left turn and sat right next to Mr. Ward.

174.    At no point during his entry did Leibovitz make any noise.

175.    For the next few minutes, Mr. Ward quietly debriefed Leibovitz what transpired in Court prior to his arrival.

176.    Mr. Ward further informed Leibovitz that he is looking to file a complaint against Defendant BENNETT and that he is anxious.

177.    Leibovitz reassured Mr. Ward not to worry because he was here as a witness.

178.    At no point while Leibovitz and Mr. Ward were waiting inside room 406D, did Leibovitz take out his phone to record the proceedings.

179.    While both Mr. Ward and Leibovitz were patiently waiting to get confirmation to leave, Defendant BENNETT asked Judge Landson if Mr. Ward can go now.

180.    Judge Landson stated , "she's (Teresa Ward) gone,  long gone by now,".

181.    ***In another example of clear sexual bias, at no point was Teresa Ward escorted out of the courthouse,  nor did the courtroom officer follow-up to determine if,  in fact, Teresa Ward actually left the courthouse.***

182.    At approximately 10:05 a.m., Defendant BENNETT gave Mr. Ward the okay to exit the courtroom.

183.    The following colloquy ensued:

> Defendant BENNETT: Mr. Ward, you can exit.
>            Mr. Ward: Before I do,  can I have your badge number?

> In response to Mr. Ward's inquiry, Defendant BENNETT raises her voice and provides him her shield number.

> Defendant BENNETT: Sure it's 3853.
>            Mr. Ward: Do you mind if I get your name?
> Defendant BENNETT: No, just use my shield number
>            Mr. Ward: So you're denying me your name?
> Defendant BENNETT: All you need to know is my shield number, that's all you need.

184.    Leibovitz and Mr. Ward  proceeded to the exit doors.

185.    Defendant BENNETT left her post and, unlike with Teresa Ward, proceeded  to follow Mr. Ward and Leibovitz to the exit doors.

186.    Upon arrival to the exit doors, Leibovitz opened the left door using his left hand and stated to Defendant BENNETT, "Ladies first."

187.    Defendant BENNETT replied, "No, I am good thanks."

188. Leibovitz responded, "You said there is a difference between.... So I am giving proper etiquette. Ladies first."

189. Defendant BENNETT stated, "I am saying it's OK!"

190. Leibovitz responded, "Your Honor, you watching this? Your Honor."

191. Defendant BENNETT then demanded Leibovitz to exit the courtroom.

192. Leibovitz stated to Defendant BENNETT, "You established that men and women...."

193. Defendant BENNETT stated, " So, Sir exit the courtroom now."

194. Leibovitz then responded, "Now I get no answer"

195. Mr. Ward proceeded to exit first entering the anteroom, followed by Leibovitz and then Defendant BENNETT.

196. While in the anteroom, Defendant BENNETT threatened both Leibovitz and Mr. Ward, stating "Do you guys want to leave out of here in handcuffs?"

197. Leibovitz then responds to Defendant BENNETT, "Are you threatening to arrest?... are you threatening to arrest?"

198. In response to this blatant threat, Leibovitz's sense of urgency was elevated to the point that he withdrew his cellphone.

199. While exiting the anteroom and entering the hallways outside courtroom 406D, Leibovitz immediately proceeded to record, in clear site of Defendant BENNETT.

200. Both Mr. Ward and Leibovitz started walking in the direction towards the vestibule, a public area by the elevators with the intention to go down to the third floor to get Mr. Ward's minutes from the hearing that was just conducted and then eventually to go home.

201. At approximately 10:14 am, Defendant BENNETT noticed that Leibovitz was recording and stated in part, "You can't record anything in the courthouse".

202. Leibovitz responded, "I want to hear that statute".

203. Defendant BENNETT requested for Leibovitz to stop recording.

204. Without any hesitation, Leibovitz immediately responded, "I am taping it, I am in self-defense mode now, please don't touch me".

205. While still in the hallways walking in the direction towards the elevators on the 4th floor, Defendant BENNETT used her right hand to reach out for her walkie-talkie and called for back up.

206. While Defendant BENNETT was calling for back up, Mr. Ward informed Leibovitz to state what his intentions are.

207. After observing Defendant BENNETT in room 406D specifically how she reacted to Mr. Ward's shield number inquiry as well as threatening to take both of them out in handcuffs while in the anteroom, Leibovitz went with his gut feeling that Defendant BENNETT could not be trusted.

208. Leibovitz stated, "My intent is just to see what is going on here. I am taping it. I am allowed to."

209. Once again Defendant BENNETT stated, "No you are not".

210. Leibovitz responded, "What statute? "

211. Mr. Ward then chimed in and states, "What law?"

212. Once again Defendant BENNETT failed to provide an answer to both Mr. Ward and Leibovitz.

**Arrival to the Vestibule Elevator Bank**

213.     The fourth floor vestibule elevator bank area has 6 elevators. The first elevator on the left is number 1; next to it is number 2, and next to it is number 3. Across from number 1 is elevator 4, across from number 2 is elevator 5 and across from number 3 is elevator 6. On the side by elevator 4,  is room 403 then room 402 and then room 401. On the side by elevator 1 is room 404, then room 405 and then room 406.

214.     Upon arrival to the vestibule elevator bank, Leibovitz positioned himself with his back to the wall by elevator 1 with his cell phone out recording, clearly visible to everyone. Mr. Ward is positioned in the middle between elevator 1 and 4.  Defendant BENNETT is first positioned to the right of Leibovitz and then centers herself.

215.     During the time Leibovitz and Mr. Ward are by the vestibule area, the only people present from the general public are waiting outside room 403 completely away from the elevators, some standing and some sitting on the benches.

216.     Approximately 12-16 court officers respond to Defendant BENNETT's call and arrive at approximately plus or minus a few minutes from each other.

217.     The officers that arrived to the scene are Defendants ROSSI and State Defendants.

218.     Defendant ESPOSITO was positioned directly in front of Leibovitz.

219.     Defendant BENNETT immediately addressed Defendant ROSSI stating in part, "Lieutenant, this gentleman is recording this. Could you please…"

220.     Defendant BENNETT deliberately failed to mention that  Leibovitz was  recording in direct response to a perceived threat from Defendant Bennett.

221.   Defendant ROSSI attempts to seize Leibovitz's phone however Leibovitz immediately pulls his phone away.

222.   Leibovitz responds by stating, "Hey what are you doing, get off my phone, it's my property."

223.   Defendant ROSSI responds to Leibovitz stating, " Ho, Ho, Ho…"

224.   Leibovitz states, "Ok".

225.   Kenny Ward states, "We spoke to you before".

226.   Defendant ROSSI responds, "About what?"

227.   Defendant BENNETT then instructs Mr. Ward to step away.

228.   Mr. Ward inquires, "Step away for what?"

229.   While this is happening, Defendant CANNON immediately gets involved and assaults Mr. Ward by putting his hands on Mr. Ward and pushes him over to elevator 6 and yells, "Step away!!  Step away….When you are told to step away you step away."

230.   Defendant ROSSI once again attempts to grab Leibovitz's phone for which Leibovitz responds, "Get off my phone please, it's my property."

231.   Defendant ROSSI states, "Not unless you are recording something here."

232.   While these events are unfolding, Leibovitz is wondering why nobody in authority is asking him why he's recording.

233.   Leibovitz responds to Defendant ROSSI , "At the end of the day we were in Court, we have a biased court officer over here, who said that she …is a male ….is a difference….."

234.   While Leibovitz is attempting to enlighten Defendant ROSSI what transpired during Mr. Ward and his interaction with Defendant BENNETT while in room 406D, in the background the following colloquy ensues between Mr. Ward and Defendant CANNON:

> Defendant CANNON yells:  Stay over here.
> Mr. Ward:  I am allowed to do what I want.
> Defendant CANNON:  No you are not, no you are not.
> Leibovitz:  It's our courthouse.
> Defendant ROSSI: Relax!!

235.   Leibovitz continues, "So I was polite, I said to her, I wanted to open the door for her (Defendant BENNETT) because she is discriminating against us men, when his wife is stealing his property, so I open the door for her, I said ladies first, I mean we believe in proper etiquette, and now she is being a…..she is harassing me."

236.   At no point do any court officers inquire what Leibovitz meant by Defendant BENNETT harassing him.

237.   Instead, Defendant ROSSI focused only on the recording and states, "We are dealing with the recording here."

238.   Leibovitz immediately responds, "It's not about the recording.  Alright, I am going to stop it now. Because I want it on the record. Because if I am touched this is my evidence, and the court's do this on purpose so we don't stand up for our rights."

239.   Defendant ROSSI chimes in,  "Let me ask you something, hold on a second"

240.   Leibovitz responds, "Okay so we will leave. My intent….It's all about mens rea. My intent is now to walk out with no problems…..If I am touched I will file grievance with the

court, with the Comptroller, then file a lawsuit…..I know how to sue you guys, you guys have no judicial immunity on this, ……"

241.   Defendant ROSSI states, "Listen to me."

242.   Leibovitz responds, "I am walking out… Witnesses thank you…"

243.   Defendant ROSSI responds, "If you are recording something, you can't record something…."

244.   Leibovitz chimes in stating,  "There is a reason why we cannot record because of this……If I don't record this then you guys could do whatever you want."

245.   Defendant ROSSI continues, "You have the opportunity to proceed this  in court. However,  you are not allowed to record anything in the courthouse"

246.   Leibovitz responds, "There is a reason why….To protect you guys from [when] doing shady stuff"

247.   Defendant ROSSI continues, "I am not here to make those decisions, only to enforce."

248.   Leibovitz responds, "My intent, guys my intent, my intent is to have no problems here, but if she is going to violate my rights, we the people can stand up for our rights, don't touch me sir"

249.   Defendant ROSSI exemplifies the attitude of officers who are more concerned with protecting their fellow officers, who have been accused of abusing their authority, then they are of upholding the law and guaranteeing that justice is served.

250.   Defendant ROSSI responds, "Now you are grandstanding….and I am not going to stand"

251.   Both Defendant BENNETT and Defendant ROSSI state, "Stay where you are, you are here"

252.   Leibovitz states to Mr. Ward, "Kenny, you ready to go?"

253.   Then Leibovitz addresses Defendant ROSSI and states, "Are you detaining me?"

254.   Defendant ROSSI immediately responds, "Yes we are"

255.   Leibovitz instantly responds, "On what grounds?"

256.   Defendant ROSSI states, "On recording here."

257.   Leibovitz responds, "I am allowed to record."

258.   Defendant ROSSI, "No you are not."

259.   Leibovitz responds, "What law?"

260.   Defendant ROSSI, "You are not allowed to record here."

261.   Leibovitz says, "Please state the law."

262.   Defendant ROSSI states, "If I have to go look it up in …."

263.   Leibovitz responds, "I'll walk with you….Let's go…Look it for me…"

264.   Defendant ROSSI states, "Listen…."

265.   Leibovitz responds, "I'll walk with you!   You already….You quickly tell me not to record but you don't know the statute?? "

266.   Finally two officers, Defendant O'BREIN and Defendant ESPOSITO respond to Leibovitz's inquiry, "It's under the chief administrative rule……"

267.   Leibovitz inquires, "What number? What number?"

268.    Defendant O'BREIN responds, "Go look it up."

269.    Leibovitz states, "Alright!   Can I go look it up???   Alright I am going to look it up right now."

270.    Leibovitz proceeds to stop recording   and is about to look up the administrative rule on his cell phone when Defendant BENNETT once again says Leibovitz can't record and orders him to go down to the third floor.

271.    According to the NYS Court Officer Trainee Manual some of the functions of a court officer is to provide courthouse and courtroom security. Court Officers provide a safe and secure environment for the fair and prompt resolution of all matters before the courts. The job is a blend of security work, public relations, law enforcement, prisoner management, and clerical duties.   A strong sense of responsibility is necessary, as well as good judgment, patience and impartiality.   Court Officers must not favor one party over another in a court proceeding. They protect and enhance the judicial process itself.   A Court Officer is usually the first person a visitor to court will approach for information. The officer's tone and demeanor can help out people at ease and establish confidence in the judicial process.   In their actions, Court Officers must reflect impartiality, fairness and commitment to justice.

272.    Instead of exercising good judgment, patience and mitigating the situation by allowing Leibovitz to look up the said "administrative rule" by using his smartphone to ease his concerns and establish confidence, Defendant BENNETT instead states " I want you to go downstairs to the 3rd floor."

273.    When Leibovitz stopped recording, any opportunity to present further evidence of wrongdoing by the officers was suspended indefinitely.

274.    After a couple minutes, where Leibovitz finally felt that even Teresa Ward wouldn't show up, Leibovitz finally agreed to go down to the third floor to look up the law.

275.   Prior to following the officers into the elevator, Leibovitz attempted to attract the attention of individuals standing in front of Room 403, in the hope of obtaining some witnesses to the events which were unfolding at that time.

276.   At the last second before entering the elevator, Leibovitz exclaimed "witnesses" .

277.   At this point, Mr. Ward wasn't going to leave Leibovitz unobserved and let him go by himself in light of what was occurring.

278.   Leibovitz came to the courthouse as a witness for him.

279.   Mr. Ward couldn't leave Leibovitz at this point, it would be wrong.

280.   At this point, Leibovitz and Mr. Ward were not arrested, there was *no concern for "the public"* only that Leibovitz was recording.

281.   Defendant BENNETT proceeds to enter elevator 1, then Leibovitz, some of the State Defendants, and then Mr. Ward.

282.   Upon the elevator's arrival to the third floor, Defendant BENNETT exits the elevator first, followed by Leibovitz, some of the State Defendants and then Mr. Ward.

283.   Defendant BENNETT, some of the State Defendants, Mr. Ward and Leibovitz walk approximately 67 feet to the glass door, which leads to the administrative office.

284.   Upon entering, the first door to the left is Defendant BARRY's office, then two benches situated side by side against the wall and then room 367.

285. Defendant O'BRIEN gave Leibovitz a hard time about recording for which Leibovitz responded, "What do you have to worry about? Why are you so nervous? Mr. Ward and I need to protect ourselves from corrupt people."

286. Defendant John Doe #2 then attempts to apply a tactic of divide and conquer, a strategy to gain and maintain power, by telling Mr. Ward to leave for which both Mr. Ward and Leibovitz once again both state we stick together.

287. Defendant BENNETT immediately orders Leibovitz to sit which he complies.

288. Leibovitz sits on the first bench closest to room 367 while Mr. Ward sits down quietly on the bench closest to Defendant BARRY's room.

289. Defendant BENNETT then enters room 367 with three officers and speaks to Defendant LOWE and some other officers.

290. Outside room 367 were the State Defendants.

291. Defendant BENNETT exits room 367 and nothing is said.

292. A few minutes later, Defendant LOWE comes out from room 367, and pointed directly to Mr. Ward and says to Jane Doe #1, "Give him an order and then arrest him!!!"

293. Jane Doe #1 says to Mr. Ward, "If you get up now you can leave."

294. At that point Mr. Ward states, "Etan, what do you want me to do?"

295. Feeling threatened once again, Leibovitz gets up and says "Why does he have to leave?"

38

296.   No one responds.

297.   After a few seconds pass, Leibovitz then further states, "I will erase my video from my phone".

298.   After witnessing Defendant LOWE tell a court officer to give an unlawful order to Mr. Ward and then arrest him, Leibovitz knew what he was up against.

299.   Leibovitz had absolute no intention to erase his evidence but instead stood up and was about to start recording once again when Defendant LOWE grabbed his phone from behind.

300.   Before Leibovitz could react, Defendant LOWE headed back inside room 367.

301.   Defendant VASQUEZ, with the help of Defendant ESPOSITO, effectuated the arrest on Mr. Ward.

302.   Defendants VASQUEZ and ESPOSITO escort Mr. Ward downstairs and place him in the first floor holding cell.

303.   Leibovitz sits back down on the bench.

304.   Defendant BENNETT goes back inside room 367.

305.   A few minutes later, Defendant BENNETT comes back out and effectuates the arrest on Leibovitz.

306.   Upon effectuating the said arrest, Leibovitz asks Defendant BENNETT "What's your probable cause to arrest me?"

307.   Defendant BENNETT never responds.

308.   Defendant BENNETT then escorts Leibovitz downstairs to the first floor and places Leibovitz in the Court's holding cell with Mr. Ward.

309.   Defendant BENNETT removes Leibovitz's right handcuff and attaches it to the metal bar that is attached to the wall.

310.   While waiting in the holding cell, an unidentified court officer informed both Mr. Ward and Leibovitz that they are just going to be issued a summons.

311.   Approximately two hours later, Defendant BENNETT came back down, removed Leibovitz's handcuffs from the metal bar and proceeded to effectuate the arrest.

312.   Defendant BENNETT read Leibovitz his Miranda rights and he was escorted out of the courthouse to the 103rd Precinct.

313.   A few minutes later, Defendants VASQUEZ and ESPOSITO escorted Mr. Ward out of the courthouse to the 103rd Precinct.

314.   Mr. Ward and Leibovitz are both arrested respectively 24 and 27 minutes after Leibovitz is first detained on the 4th floor. *At no point* did Leibovitz or Mr. Ward threaten, curse and assault anyone.

## 103rd Precinct

315.   At approximately 12:40 pm, Leibovitz is placed in a New York State Court vehicle and is transported to the 103rd Precinct.

316. At approximately 12:55 pm, upon his arrival to the 103rd Precinct, Leibovitz is placed and confined in a 4 foot by 6 foot holding cell that includes two other arrestees.

317. At approximately 12:55 pm, Mr. Ward is placed in a New York State Court vehicle and is transported to the 103rd Precinct.

318. At approximately 1:10 p.m., Mr. Ward arrives at the 103rd Precinct and is placed and confined in an adjacent 4 foot by 6 foot holding cell.

319. A little after a half hour, both Mr. Ward and Leibovitz were fingerprinted and photographed.

320. Both Mr. Ward and Leibovitz asked the police officers multiple times if they could place a phone call but their responses were that the court officers are responsible for them.

321. A half hour later, Detective Rodriquez removed Mr. Ward from the holding cell as a result of Defendant DIAQUOI's I-card.

322. Mr. Ward is once again fingerprinted and photographed and then placed right back in the holding cell.

323. Defendants VASQUEZ and ESPOSITO came in several times during Mr. Ward and Leibovitz's confinement at the 103rd Precinct and informed both of them that eventually Mr. Ward and Leibovitz will be able to place their phone calls.

324. During Leibovitz and Mr. Ward's stay at the 103rd Precinct, neither Mr. Ward nor Leibovitz were given an opportunity to place a call to inform any family members or friends of their location.

325. A little after 4:00 p.m., Leibovitz is once again placed in a New York State Court vehicle.

326.   Leibovitz is transported to Queens Central Booking and arrives at 4:25 p.m.

327.   A little after 4:20 p.m., Mr. Ward is once again placed in a New York State Court vehicle.

328.   Mr. Ward is transported to Queens Central Booking and arrives at 4:45 p.m.

329.   Early that evening Leibovitz is transferred from the NYPD's custody to the Department of Correction's custody and is placed in a holding cell with several other arrestees.

330.   Leibovitz is still unable to place a call to notify a friend or family member.

331.   A few minutes after Leibovitz is transferred from the NYPD's custody to the Department of Correction's custody, Mr. Ward is transferred as well and is placed in a separate holding cell with several other arrestees.

332.   Unlike Leibovitz, Mr. Ward is able to place a call and gets a hold of Ms. Linda Martin.

333.   Later that evening, Madeline Porta Esq. from Legal Aid is assigned to represent Leibovitz.

334.   Later that evening, Mr. Ward is assigned a male attorney.


## Arraignment- April 16th, 2014, 10:35 p.m.

335.   At approximately 10:35 p.m., both Mr. Ward and Leibovitz, with their respective attorneys' by their side, stood before Judge Hawkins for arraignment.

336.    The lawyers for Leibovitz and Mr. Ward argued that their client's cases should be dismissed because the complaints are facially deficient. In the alternative, if Leibovitz and Mr. Ward's cases weren't dismissed then both Mr. Ward and Leibovitz should be released on their own recognizance.

337.    That night, Judge Hawkins' temperament reminded both Leibovitz and Mr. Ward once again how the New York State Commission on Judicial Conduct has failed the people of the state of New York.

338.    Mr. Ward respectfully requested to speak on his behalf and without any reason or justification was denied by Judge Hawkins.

339.    Upon his denial, Mr. Ward was adamant about being heard due to his frustration with the courts, with his other pending cases and today's arrest.

340.    As a result, Judge Hawkins berates Mr. Ward and has the court officers escort him out of the courtroom.

341.    That night Leibovitz bit his tongue and decided to fight his battle once he was free to file motions.

342.    Judge Hawkins set bail at $1000 each for both Mr. Ward and Leibovitz's arrest.


**Docket number # 2014QN021752**


343.    The QDAO filed complaints No. 021752/14 and No. 021751/14 charging Mr. Ward and Leibovitz respectively with one count of:

    (1) Obstructing governmental administration in the second degree.

344.     In Mr. Ward and Leibovitz's criminal complaint, Defendant BENNETT of Queens Civil

Court, Tax Reg #: 517100, being duly sworn, deposes and says that: The above offense was

committed as follows:

> On or about April 16th, 2014 between 10:05AM and 10:25AM,
> inside of 89-17 SUTPHIN BOULEVARD (QUEENS CIVIL
> COURT), COUNTY OF QUEENS, STATE OF NEW YORK, the
> defendants committed the offense of: PL 195.05 OBSTRUCTING
> GOVERNMENTAL   ADMINISTRATION   IN   THE   SECOND
> DEGREE.

> Deponent states that at the above mentioned date, time , and place of
> occurrence the defendants, Etan M. Leibovitz and Kenneth J Ward
> Jr. were inside of the above mentioned location, which is the Queens
> Civil Court House.

> Deponent further states that the defendant, Etan M. Leibovitz, took
> out his phone and proceeded to record on his phone in the vestibule
> area of the court room.

> Deponent further states that when she approached the defendant,
> Etan M. Leibovitz, and instructed him to stop recording with his
> phone, the defendant refused to comply with the deponent's lawful
> order and continued to record.

> Deponent further states that when the defendant, Etan M. Leibovitz,
> was approached by Lieutenant O'Brien, the defendant, Kenneth J.
> Ward Jr. stepped in between Lieutenant O'Brien and the defendant,
> Etan  M.  Leibovitz,  and  obstructed  the  above  mentioned
> investigation.

> Deponent further states that the defendants were yelling and
> screaming in the hallways of the above mentioned location causing a
> crowd to gather.

**Docket number # 2014QN021757**


345.     Judge Hawkins set bail at $1000 for Mr. Ward's I-card arrest.


346.     The QDAO filed complaint No. 021757/14 charging Mr. Ward with one count of

criminal contempt in the second degree (Penal Law 215.50[3]) and one count of harassment

in the second degree (Penal Law 240.26[1]).

347.    In Ward's criminal complaint,  Defendant DIAQUOI of Queens Detective Area 104, Tax

Reg #: 930046, being duly sworn, deposes and says that:

> On or about April 3, 2014 at about 6:00pm, in front of 83-13 Myrtle
> Avenue, County of Queens, State of New York, the defendant
> committed the offenses of: One count of criminal contempt in the
> second degree (Penal Law 215.50[3]) and one count of harassment
> in the second degree (Penal Law 240.26[1]).

> The above offenses were committed as follows:

> Deponent is informed by the complainant, Teresa Rodriguez, that at
> the above mentioned date, time, and place of occurrence the
> defendant, Kenneth Ward, came to her residence, and proceeded to
> bang on her door several times. Deponent is further informed by the
> complainant that when she opened the door to her resident to
> confront the defendant, the defendant proceeded to curse and yell at
> the complainant.

> Deponent is further informed by the complainant that the above
> mentioned actions of the defendant caused her annoyance and alarm.

> Deponent states that he has reviewed an order of protection issued
> on the behalf of the complainant Teresa Rodriguez by the Honorable
> Judge Gerald of the Queens Supreme Court, under index number
> 016944/2011, issued on February 25, 2014 which is in effect until
> May 15, 2014 and which states, among other things, that the
> defendant Kenneth Ward is to refrain from assaulting, stalking,
> harassment, menacing, reckless endangerment, disorderly conduct,
> intimidation, threats or any other criminal offense against the
> complainant.  Deponent states that he has examined the copy of said
> order of protection and that the deponent is aware of said order in
> that the box stating party against whom order was issued was
> advised in court of issuance and contents or order.

348.    The next court appearances were scheduled for April 21st , 2014 for Mr. Ward's two

cases.

349.    At the conclusion of the arraignment, Judge Hawkins yelled and ordered for both, Mr.

Ward and Leibovitz to get lawyers, since their financial questionnaire that was filled out that

night, showed they didn't qualify for 18B lawyers.

350.    On or about April 17th, 2014, at midnight, approximately 16 arrestees, Mr. Ward, and Leibovitz were transferred over to Rikers Island, C-95.

**Leibovitz Released**

351.    At approximately 9:05 p.m., Leibovitz was finally released from the custody of the Department of Corrections.  At the release station, Leibovitz's friend Linda Martin, who posted bail on his behalf, was still in the waiting area after arriving at approximately 1 pm that afternoon.  Ms. Martin kindly dropped Leibovitz off by the Queens Central Booking.

352.    Upon Leibovitz's release, he discovered that the Queens Civil Court was in possession of his personal property, which included his wallet, jacket, legal paper work and house keys.

353.    Luckily for Leibovitz, his sister and her boyfriend just got back from their vacation and were inside the apartment to pick up their dog.

354.    Leibovitz entered the apartment at approximately 10 pm.

355.    On April 18th, 2014, at approximately 2:05 am, Mr. Ward was finally released from the custody of the Department of Corrections.

356.    Upon Mr. Ward's release, he discovered that the Queens Civil Court was in possession of his personal property, which included his wallet, jacket, legal documents, briefcase and house keys.

357.    Since the Queens Civil Court would not open until the following morning at 9 AM, and since the Court Officers were in possession of all of Mr. Ward's critical personal property, the only option at his disposal was to find a shelter from the unseasonably cold weather. Mr. Ward was therefore forced to spend the rest of the night inside the Lexington Hotel bathroom in order to stay warm.

358.   On April 18th, 2014, after a surprisingly good night sleep, Leibovitz woke up a determined man.

359.   Leibovitz was ready to seek justice and was adamant about filing a motion to dismiss for that following Monday, the next return court date.

360.   Leibovitz first needed to pick up his personal property from Queens Civil Court and then the criminal complaint from his lawyer.

361.   At approximately 9:50 that morning, Leibovitz was at the Queens Civil Court picking up his personal property.

362.   Leibovitz's property was returned with the exception of his cell phone which was held for evidence.

363.   At 12:30 that afternoon, Leibovitz made a quick stop at the Queens Supreme Court Law Library to get some legal information with regards to Obstructing Governmental Administration in the second degree.

364.   At approximately 1:10 pm, Leibovitz stopped by Queens Civil Court, hoping to be able to identify all the parties who were involved with his and Mr. Ward's arrest and to verify the room numbers where Mr. Ward and Leibovitz sat peacefully until they were arrested.

365.   Later that afternoon, at approximately 2:28 pm, Leibovitz reached out to his attorney Ms. Porta, inquiring when was a good time for him to stop by her office to pick up the criminal complaint.  At approximately 3:42 p.m., Leibovitz met up with Ms. Porta.

366.   That weekend, Mr. Ward and Leibovitz met to discuss filing their pretrial motions.

**April 21st, 2014, AP-1 Calendar**

367.   On April 21st, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Serita.

368.   Prosecuting on behalf of the People were  Kevin Fogarty and on information and belief, Defendant PISCIONERE.

369.   The following transpired:

   A.     Judge Serita, granted both Leibovitz and Mr. Ward's request to have their lawyers relieved so that they can move to proceed pro se;

   B.     Leibovitz and Mr. Ward's case was adjourned for May 15th , 2014.

370.   At approximately 12:00 pm,  Leibovitz and Plaintiff were informed by Kevin Begley, chief clerk for the Queens Integrated Domestic Violence Court, that on the previous weekend,  four (4) foot signs stating

   "No cameras or audio/video recording devices may be used in
   this courthouse unless expressly authorized by the Supervising
   Judge"

had been placed in Queens Criminal Court and other Queens courthouses. Later, on  June 18th, 2014, two months after Leibovitz and Mr. Ward's arrest, the State of New York Unified Court System Department of Public Safety instituted a new directive, Number 2-2014, Subject Audio/Video Devices. This represents direct and incontrovertible evidence that no such policy regarding the use of such devices was in effect as of April 16, 2014, when the incident leading to the arrest of Leibovitz and Mr. Ward occurred.

371.   Later that afternoon, Leibovitz filed his first Motion to Dismiss pursuant to CPL 170.30 and CPL 170.40 in the Interest of Justice.

372.   A week later, in the early afternoon on April 29th, 2014, both Mr. Ward and Leibovitz stopped by Queens Civil Court.

373.   Upon going through the security scanning process in order to enter the court, both Mr. Ward and Leibovitz's cell phones were confiscated by a court officer, vouchered and then returned to Mr. Ward and Leibovitz upon their departure.

374.   The following week, in the late morning on May 6th, 2014, Leibovitz stopped by Queens Civil Court once again to verify the status of his pending case.

375.   Upon going through the security scanning process to enter the court, Leibovitz's "replacement cell phone" was once again confiscated by a court officer, shield # 1955, vouchered, and then returned to Leibovitz upon his departure.


## May 15th, 2014, AP-1 Calendar


376.   On May 15th, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Judge Golia.

377.   Prosecuting on behalf of the People were Kevin Fogarty and Defendant PISCIONERE.


378.   The following transpired:

    A.      Judge Golia granted both Leibovitz and Mr. Ward their pro se application;

    B.      18B lawyer Stephen A Gargiulo was assigned to be both Leibovitz and Mr. Ward's legal advisor;

    C.      Judge Golia informed the People, Mr. Ward and Leibovitz that pretrial motions need to be filed by June 9th, 2014 and responses by June 30th, 2014.

    D.      The next return date was scheduled for July 24th, 2014, AP-1.

**May 15th, 2014, QIDV- Calendar**

379.   On May 15th, 2014, Mr. Ward's case was called on the QIDV calendar before Judge Lenora Gerald.

380.   Prosecuting on behalf of the People was Defendant HARPER.

381.   The following transpired:

> A. Judge Gerald granted Mr. Ward's pro se application and relieved the Queens Law Associates;
> B. The People offered Mr. Ward a plea to a disorderly conduct with a conditional discharge and a full order of protection;
> C. Mr. Ward respectfully stated, " Absolutely not your Honor";
> D. Mr. Ward provided Judge Gerald notice that Defendant HARPER wanted Mr. Ward to sign a false corroborating affidavit for Teresa Ward's arrest;
> E. Defendant HARPER stated that this is not applicable to this case and that the charges against Teresa Ward, in which Mr. Ward was the complaining witness, were dismissed;
> F. Mr. Ward requested that his bail money be released;
> G. The next return date was scheduled for June 27th, 2014, QIDV.

382.   Later that day, Leibovitz filed an Omnibus Motion where he requested that his case be dismissed pursuant to CPL 170.30 , 170.40, and in the alternative if his case was not dismissed, he requested discovery, bill of particulars, Brady Material, Hearings: Sandoval, Dunaway and Huntley and for the Court to grant him leave to submit subsequent motions, should facts discovered through his motion or hearings related to this motion, indicate that additional relief may be warranted.

383.   On June 3rd, 2014, Leibovitz filed another motion, motion to dismiss pursuant to CPL 170.30, CPL 170.35 that the statute defining the offense is unconstitutional or otherwise invalid.

**June 4th. 2014 Leibovitz  records his conversation with ADA Piscionere**

384.    On June 4th, 2014, Leibovitz was notified upon calling Defendant PISCIONERE that the State of New York, on July 24th, 2014 will voluntarily dismiss the charge against him, PL § 195.05: Obstructing Governmental Administration in the second  degree,  based on the grounds that the QDAO doesn't have enough evidence to go forward,  however,  the QDAO would still prosecute Mr. Ward.

385.    Leibovitz was very happy to receive the great news that justice had seen its course but was concerned what evidence the QDAO had on Mr. Ward for them to even prosecute him.

386.    Luckily for Leibovitz, he recorded the said conversation.

387.    On June 6th, 2014, Leibovitz entered Queens Civil Court.

388.    Upon going through the security scanning process, Leibovitz's "replacement phone" was once again confiscated by a court officer, vouchered and then returned to Leibovitz upon his departure.

389.    On June 13th, 2014, Leibovitz stopped by Queens Civil Court once again to verify the status of his pending case.

390.    Upon going through the security scanning process to enter the Court, Leibovitz's "replacement cell phone" was once again confiscated by a Court Officer, shield # 2534, vouchered and then returned to Leibovitz upon his departure.

391.    On June 20th, 2014,  Leibovitz entered Queens Civil Court and stopped by Defendant BARRY's office to voice his concerns and inform Defendant BARRY that post arrest, every time Mr. Ward and Leibovitz entered the courthouse both Mr. Ward's and his phone were confiscated by the court officers, vouchered and then returned to them upon their departure.

392.    Defendant BARRY addressed Leibovitz's concerns by informing him that it's now a court policy to seize both Leibovitz and Mr. Ward's cell phones upon entry.

393.    Curious to know what law he broke, Leibovitz asked Defendant BARRY who implemented this policy.

394.    A little shaken up by Leibovitz's interrogation, Defendant BARRY responded stating he doesn't know the exact law off the top of his head.

395.    Leibovitz left off by asking if Defendant BARRY could provide him the following answer sometime next week.

396.    Defendant BARRY assured Leibovitz that he would have the answer for him and handed Leibovitz his contact card.

## June 27th, 2014 QIDV- Calendar

397.    On June 27th, 2014, Mr. Ward's case was called on the QIDV calendar before Judge Gerald.

398.    Prosecuting on behalf of the People was Defendant STAINES.

399.    The following transpired:

A.    Pursuant to CPL 170.65, Defendant STAINES filed and served a superseding information adding five more charges, Disorderly Conduct PL 240.20 (3 and 5), Endangering the Welfare of a Child PL 260.10 (1), Menacing in the third degree PL 120.15 and Trespass PL 145.05.

Teresa Ward, of an address known to the district attorney's office being duly sworn, deposes and says that on or about April 3, 2014 between 5:30 pm and 6:00pm outside of 83-13 Myrtle Ave, County of Queens, State of New York the defendant committed the offenses of:

PL 215.50-3 Criminal Contempt in the second degree
PL 260.10-1 Endangering the welfare of child
PL 120.15 Menacing the third degree
PL 240.20-3 Disorderly Conduct
PL 240.20 -5 Disordering Conduct
PL 145.05 Trespass
PL 240.26 Harassment in the second degree

The source of deponent's information and the grounds for deponent's belief are as follows:

Deponent states that at the  above mentioned date, time and place of occurrence the defendant, Kenneth Ward, came to her home, banging and kicking on her front door.

Deponent further states that when she opened the door she told him "You are not allowed to be here. I will call the police."

Deponent further states that the defendant was standing on her front stairs and attempted to hand papers to her.

Deponent further states that the defendant walked to her gate trying to leave the front yard.

Deponent further states that the defendant began yelling at her stating "Mother fucker, you need to pay the rent. You're going to get evicted. You owe me $5000 in rent.  You  fucking bitch you're trying to steal my money" while blocking her sidewalk.

Deponent further states that their  eight year old son, Jon Paul Ward, was present during the incident.

Deponent further states that she has no trespassing signs on her front gate and that she has exclusive use and occupancy of the property.

Deponent further states that her tenants and her neighbor began to gather to watch the incident.

Deponent further states that the above mentioned actions of the Defendant caused her to be intimidated, to fear physical injury, annoyance and alarm.

Deponent states that she has an order of protection issued on her behalf by the Honorable Judge Gerald of Queens Supreme Court under index number 016944/2011 issued on February 25, 2014 which is in effect until May 15, 2014 and which states among other things that the defendants is to refrain from assaulting, stalking, harassment,

menacing, reckless endangerment, disorderly conduct, intimidation, threats or any other criminal offense against the complainant.

Deponent states that the defendant is aware of the order in that the defendant was present in court during the issuance of the order and the order indicates that he was advised in court of the issuance and contents of the order.

B.      The next return date was scheduled for September 16th, 2014, QIDV.

400.   On July 1st, 2014, Mr. Ward stopped by Queens Civil Court.

401.   Upon going through the security scanning process to enter the court, Mr. Ward's cell phone was confiscated by a court officer, vouchered and then returned to Mr. Ward upon his departure.

## The July 7th, 2014 Incident

402.   On July 7th, 2014, at approximately 1:30 pm, Leibovitz entered Queens Civil Court and went through the usual security scanning process.

403.   Leibovitz's "replacement cell phone" was once again confiscated by a Court Officer and vouchered.

404.   Leibovitz unwillingly gave up his phone and proceeded up to the third floor.

405.   Upon entering Defendant BARRY's office, Leibovitz was unfortunately notified by Defendant BARRY's secretary that he stepped out.

406.   Leibovitz left a letter with his secretary, requesting that Defendant BARRY review the Supremacy Clause and ex parte Young.

407.   Upon leaving Defendant BARRY's office, Leibovitz decided to stop by Defendant LOWE's office, room 367.

408.   Upon entering room 367, Leibovitz walked over to Defendant LOWE's office.

409.   Defendant LOWE's office is situated all the way to the back in room 367.

410.   Inside Defendant LOWE's office stood Defendant LOWE to the right and a female court officer to the left.

411.   Upon arrival, Leibovitz asked Defendant LOWE if he is currently aware that the one count for Obstructing Governmental Administration in the second degree against him was being dropped by the QDAO on July 24th, 2014.

412.   Defendant LOWE nonchalantly responded that he did not know that.

413.   Leibovitz followed up by stating that he is looking forward to seeing Defendant LOWE in Federal Court for violating his civil rights as well as Mr. Ward's.

414.   Defendant LOWE responded, "I have seen Federal Court many times before".

415.   Leibovitz left off by asking Defendant LOWE if he was familiar with the Supremacy Clause, Ex Parte Young and the Constitution.

416.   Defendant LOWE looked a little flustered that he is being questioned about his past misconduct, however, after a few minute he was finally able to collect himself and responded by stating that he is not aware.

417.   Leibovitz then took a few minutes to explain the Supremacy Clause and advised Defendant LOWE to read up on it before he violates anyone else's rights.

418.   Leibovitz then reiterated that he is looking forward to seeing Defendant LOWE in Federal Court one day.

419.   Leibovitz then left Defendant LOWE's office and peacefully walked in the direction towards the exit door.

420.   While walking towards the exit door, a court officer yelled at Leibovitz, "Fucking punk".

421. Leibovitz smiled and said out loud, "Can't wait to see all of you who were involved in the April 16th, 2014 false arrest in Federal Court."

422. At approximately 1:45 pm, Leibovitz exited room 367 and peacefully walked over to the elevators.

423. While patiently waiting for the next elevator to arrive, Leibovitz stood equidistant from elevator #1 and #4.

424. Defendant LOWE exited room 367 with Court Officer shield #687, an unidentified court officer and Defendant ESPOSITO by his side.

425. Defendant LOWE, Court Officer shield #687, an unidentified court officer and Defendant ESPOSITO start walking in the direction towards Leibovitz.

426. Court officer shield #687, an unidentified court officer and Defendant ESPOSITO surround Leibovitz.

427. Defendant LOWE positioned himself standing approximately 10 feet away from Leibovitz, with his back facing the administrative office and room 367.

428. Defendant LOWE then threatened to arrest Leibovitz once again.

429. Leibovitz replies, "I am not afraid to get arrested, please do. What happens after, is the fun part, I will see you again in Federal Court. Don't you know by now I am not afraid to get arrested!!!."

430. Elevator #4 arrived on the 3rd floor and Leibovitz proceeds to enter.

431. Leibovitz then turns around and Defendant LOWE is in his face stating, "You are a punk. You have a big mouth and you should watch out."

432. Leibovitz then laughs and says, "How funny and ironic is this. Where is my cell phone when I need it? Why don't we go down stairs and you say this shit to me in front of the general public?"

56

433.   Realizing that Leibovitz was not afraid to get arrested nor intimidated, Defendant LOWE, Court Officer shield #687, an unidentified court officer and Defendant ESPOSITO make a U-turn.

434.   Still emanating with anger and frustration that he didn't have his phone to record what just transpired, Leibovitz can't hold back and yells, "You fucking punks."

435.   The elevator door is halfway closed when Court Officer Shield #687 gets the door to open.

436.   Defendant LOWE once again gets in Leibovitz's face and states that Leibovitz is a punk.

437.   Leibovitz replies, "Now you see the reason why we need phones (recording devices) it's for people like you."

438.   Defendant LOWE is then advised by Defendant ESPOSITO and Court Officer #687 to step back.

439.   Defendant LOWE, Court Officer shield #687, an unidentified court officer and Defendant ESPOSITO then leave the scene.

440.   Leibovitz takes the elevator down to the first floor and hands over his voucher receipt to recover his "substitute phone".

441.   Before leaving the courthouse, Leibovitz yells out loud for Defendant LOWE to come downstairs and state exactly what he said to him in the elevator.

442.   Sadly that afternoon, Defendant LOWE doesn't partake in Leibovitz's request to come downstairs.

443.   After the 3 to 4 minute outburst, exuding some mental anguish as a result of the April 16th, 2014 arrest, Leibovitz peacefully leaves the courthouse and heads directly to the Supreme Court Law Library.

444.   Leibovitz starts typing a letter directing it to Judge Golia, to inform her what just transpired on July 7th, 2014 in Queens Civil Court with Defendant LOWE.

445.   On July 8th, 2014, Leibovitz placed a call with Defendant PISCIONERE and informed her what transpired on July 7th, 2014 while he was in the Queens Civil Court.

446.   Leibovitz further informed Defendant PISCIONERE that every time he entered Queens Civil Court, his "substitute phone" was confiscated by the court officers, vouchered and then returned upon exiting.

447.   Defendant PISCIONERE reiterated that Leibovitz's criminal complaint was being dismissed on July 24th, 2014.

448.   Upon the conclusion of their conversation, Defendant PISCIONERE declined to investigate the July 7th, 2014 incident.

449.   On July 8th, 2014, Leibovitz filed the said letter with the Queens Criminal Court and served the QDAO.

450.   Leibovitz emailed the said letter to Defendant BARRY as well.  The letter emphasized the following key points:

      A.    Cameras hold public servants accountable;
      B.    Summarizes the July 7th, 2014 incident in
            Queens Civil Court;
      C.    Defendant LOWE needs to be investigated immediately.

451.   Sometime after July 8th, 2014 but before July 24th, 2014, Leibovitz was informed by Defendant BARRY that the Queens Civil Court no longer had surveillance cameras operating due to New York State failing to fix them.

452.   Upon hearing that the Queens Civil Court no longer had operable surveillance cameras, Leibovitz stated to Defendant BARRY, "now everything makes sense".

453.   On July 14th, 2014, Leibovitz once again reached out to Defendant BARRY by email to verify if he received his email and if he conducted an investigation with regards to Defendant LOWE's misconduct.

454.   With no response to his emails, on July 18th, 2014 Leibovitz placed a call with Defendant BARRY and records the conversation.

455.   On July 22nd, 2014, Leibovitz placed a call with Maureen Giddens, clerk for the county in Queens Civil Court, and informed her about his personal experience with regards to his arrest on April 16th, 2014 and what just recently happened to him on July 7th, 2014.

456.   At the end of their conversation, Leibovitz informed Maureen Giddens that he recorded their conversation and now expects to make her accountable and for her to investigate Defendant LOWE.

## July 24th, 2014, AP-1 Calendar

457.   On July 24th, 2014, Leibovitz arrived at the Queens Criminal Court, AP1, with the anticipation that his case was going to be dismissed and that he could move on with his life.

458.   Prior to going on the record, Defendant PISCIONERE notified Leibovitz that now the QDAO is willing to dismiss his case on the condition that Mr. Ward takes an ACD.

459.   Leibovitz respectfully declined Defendant PISCIONERE's offer and stated that "Mr. Ward and I will not be partaking in no such offer."

460.   Leibovitz warned Defendant PISCIONERE that he recorded their June 4th, 2014 conversation and that she is now violating his rights by maliciously prosecuting him and participating in professional misconduct.

461.   Defendant PISCIONERE informed Leibovitz that she was instructed by her supervisors to present this new offer.

462.   Upon hearing this, Leibovitz deduced that either Defendant BARRY and/or Maureen Giddens placed a call to the QDAO and influenced Defendant HERRING.

463.   On July 24th, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Judge Morris.

464.   Prosecuting on behalf of the People were ADA Kevin Fogarty and Defendant PISCIONERE.

465.   Mr. Gargiulo, legal advisor for both Mr. Ward and Leibovitz, was present.

466. Defendant PISCIONERE stated on the record that if Mr. Ward withdraws his motions and pleas to the charge, which is obstructing governmental administration, then the People will dismiss the case against Leibovitz.

467. Mr. Ward and Leibovitz both respectfully declined the People's offer.

468. Upon declining the People's offer, Defendant PISCIONERE moved the Court stating the People will be filing a superseding information adding 2 counts of disorderly conduct to both Leibovitz and Mr. Ward.

469. While still on the record, Defendant PISCIONERE served Leibovitz the People's response, dated July 23rd, 2014, to his Omnibus motion.

470. Next court date was scheduled for September 30th, 2014.

471. Sometime after June 4th, 2014 but before July 24th, 2014, knowing that any colorable cause to continue the prosecution against Leibovitz had evaporated, "we don't have enough evidence to go forward", Defendant PISCIONERE, acted in concert and conspired with Defendants HERRING, BARRY, LOWE, ROSSI and Maureen Giddens, to use any means, no matter how unlawful, to gain complaining witness Defendant BENNETT into accusing Mr. Ward and Leibovitz of two more discretionary charges, Disorderly Conduct PL 240.20 (2 and 6).

472. On July 28th, 2014, Leibovitz filed a complaint with the Supreme Court, Appellate Division, Second Judicial Department against Defendant PISCIONERE. The complaint was assigned the following case number, Q-1271-14.

473. On July 28th, 2014, Leibovitz filed a motion to recuse Defendant PISCIONERE as well as the QDAO.

474. Defendant PISCIONERE's conflict as a witness for Leibovitz's defense was imputed upon the entire QDAO.

475.    On September 2nd, 2014, Leibovitz filed a motion for an appointment of a private investigator with the Queens Criminal Court and served the QDAO.

**September 16th, 2014, QIDV- Calendar**

476.    On September 16th, 2014, Mr. Ward's case was called on the QIDV calendar before the Judge Gerald.

477.    Prosecuting on behalf of the People was Defendant STAINES. The following transpired:

      A.     Judge Gerald granted and denied Mr. Ward's motion to dismiss in part;

      B.     The following three counts were dismissed: 1 count for Trespass, 1 count of Menacing and 1 count for disorderly conduct;

      C.     In Judge Gerald's decision with regards to Mr. Ward's said motion, she reminds the People that they are obligated to produce Mr. Ward's discovery demands (ex. Teresa Ward's photos, April 3rd, 2014);

      D.     Defendant STAINES provides the Court notice that Leibovitz has called her office multiple times to express his concerns;

      E.     Judge Gerald inquired if the People were planning to file an action against Leibovitz;

      F.     Defendant STAINES informs the Court not at this time;

      G.     Judge Gerald continues all orders in effect, Mr. Ward is allowed to collect the rent from his property.

      H.     The People once again offer Mr. Ward a plea to a disorderly conduct with a conditional discharge and a full order of protection;

      I.     Mr. Ward respectfully states, "Absolutely not, no way she (Teresa Ward) perjured herself";

      J.     Judge Gerald denies Mr. Ward's requests for an Order of Protection.

      K.     The next return date is scheduled for December 4th, 2014, QIDV.

478.    Five months after the initial arrest, on September 19th, 2014, pursuant to CPL 170.65, Defendant PISCIONERE filed and served a superseding information adding two more discretionary charges, Disorderly Conduct PL 240.20 (2 and 6) for both Mr. Ward and Leibovitz.

479.   On September 24th, 2014, Defendant BENNETT falsely accused Mr. Ward of two more discretionary charges, Disorderly Conduct PL 240.20 (2 and 6). The following was added to the accusatory instrument from the original misdemeanor complaint to form the superseding information:

> Deponent further states that the defendants were yelling and screaming in the hallways of the above mentioned location causing a crowd to gather and public inconvenience, annoyance, and alarm.

> Deponent further states that she ordered the defendants to disperse and that the defendants refused to comply with said order.

480.   In Mr. Ward and Leibovitz's superseding information, Defendant BENNETT, of Queens Civil Court, Tax Reg#: 517100, being duly sworn, deposes and says that:
The above offense was committed as follows:

> On or about April 16th, 2014 between 10:05AM and 10:25AM, inside of 89-17 SUTPHIN BOULEVARD (QUEENS CIVIL COURT), COUNTY OF QUEENS, STATE OF NEW YORK, the defendants committed the offense of:

> PL 195.05 OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE, PL 240.20-2 DISORDERLY CONDUCT and PL 240-20-6 DISORDERLY CONDUCT

> Deponent states that at the above mentioned date, time , and place of occurrence the defendants, Etan M. Leibovitz and Kenneth J Ward Jr. were inside of the above mentioned location, which is the Queens Civil Court House.

> Deponent further states that the defendant, Etan M. Leibovitz, took out his phone and proceeded to record on his phone in the vestibule area of the court room.

> Deponent further states that when she approached the defendant, Etan M. Leibovitz, and instructed him to stop recording with his phone, the defendant refused to comply with the deponent's lawful order and continued to record.

Deponent further states that when the defendant, Etan M. Leibovitz, was approached by Lieutenant O'Brien, the defendant, Kenneth J. Ward Jr. stepped in between Lieutenant O'Brien and the defendant, Etan M. Leibovitz, and obstructed the above mentioned investigation.

Deponent further states that the defendants were yelling and screaming in the hallways of the above mentioned location causing a crowd to gather and public inconvenience, annoyance, and alarm.

Deponent further states that she ordered the defendants to disperse and that the defendants refused to comply with said order.

481. Sometime after September 20th, 2014 but before November 21st, 2014, Defendant PISCIONERE was no longer assigned to the prosecution of Leibovitz and Mr. Ward.

## September 30th, 2014, AP-1 Calendar

482. On September 30th, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Judge Zaro.

483. Prosecuting on behalf of the People was Kevin Fogarty.

484. Mr. Gargiulo, legal advisor for both Mr. Ward and Mr. Leibovitz, was present.

485. The following transpired:
  A. 18B lawyer Darryl Fox was assigned to Mr. Ward as his legal advisor;
  B. The People notified the Court that they filed a superseding information;
  C. Judge Zaro adjourns for October 20th , 2014

## October 20th , 2014, AP-1 Calendar

486. On October 20th, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar

before the Honorable Judge Melendez.

487.   Prosecuting on behalf of the People was Kevin Fogarty.

488.   Both Mr. Ward and Leibovitz's legal advisors were present.

489.   The following transpired:

   A.   As a result of the Court not being able to "locate" the Court's decision and order for Leibovitz's April 21st , 2014, motion to dismiss, Judge Melendez instituted a call back so that the court could attempt to locate the said papers;

   B.   On the call back, the Court notified both Mr. Ward and Leibovitz that a decision and order was only rendered for Mr. Ward's motion.

   C.   Judge Melendez adjourned for November 17th , 2014.

490.   On October 28th, 2014, Leibovitz wrote a letter to both New York State Attorney General Eric Schneiderman and Governor Cuomo informing them what was transpiring in Queens Criminal Court with regards to his case.

491.   On November 5th, 2014, Leibovitz filed a motion to dismiss the superseding information.

492.   On November 12th, 2014, Leibovitz filed another motion for an appointment of a private investigator, (which perfected his September 2, 2014 motion) with the Queens Criminal Court and served the QDAO.

## November 17th, 2014   AP-1 Calendar

493.   On November 17th, 2014, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Judge Morris.

494.   Prosecuting on behalf of the People was Kevin Fogarty.

495.   Both Mr. Ward and Leibovitz's legal advisors were present.

496.   The following transpired:

    A. Defendant HERRING made a special appearance for the People and stated that the People dismissed the top count, Obstructing Governmental Administration in the second degree, in the information for both Leibovitz and Mr. Ward, leaving only two counts of Disorderly Conduct;

    B. Judge G. Morris questioned Defendant HERRING if he was sure he wants to do that;

    C. Defendant HERRING once again stated that the People dismissed the top count for both Leibovitz and Mr. Ward;

    D. Judge G. Morris then asked the People if they have an offer for both Leibovitz and Mr. Ward;

    E. The People offered both Leibovitz and Mr. Ward an ACD for which both Leibovitz and Mr. Ward respectfully declined;

    F. Judge G. Morris stated that the Court hasn't yet rendered a decision for Leibovitz's Motion to Recuse.  The said motion was referred to the Honorable Joseph Zayas;

    G. Judge Morris further stated that she will have a decision rendered for Leibovitz's April 21st, 2014 Motion to Dismiss by this Friday.  The Court will serve Judge Morris's decision off calendar with Mr. Gargiulo;

    H. Both Mr. Ward and Leibovitz expressed their concerns that the People have not complied with their prior discovery demands pursuant to Article 240, which included requests for video surveillance footage from Queens Civil Court, April 16th, 2014 arrest and July 7th, 2014 incident;

    I. Leibovitz served the Court and the People once again with new discovery demands;

    J. Judge G. Morris ordered the People to comply with both Mr. Ward and Leibovitz's discovery demands by December 15th, 2014;

    K. Judge G. Morris replied to Leibovitz's inquiry by stating that she doesn't believe the Queens Civil Court would have video footage because they don't have cameras.

497.   On November 20th, 2014, Mr. Gargiulo was served off calendar with Judge Morris's decision and order for Leibovitz's April 21st, 2014 Motion to Dismiss.

498.    On November 28th, 2014, Leibovitz received by mail the People's opposition papers to his motion to recuse the QDAO and Defendant PISCIONERE.

499.    On December 1st, 2014, Leibovitz filed his reply papers to the People's opposition to Leibovitz's motion to recuse with the Queens Criminal Court and served the QDAO.

500.    In the People's opposition, the People cited the following case People v. Cosentino, 7 Misc. 3d 1022(A), 801 N.Y.S. 2d 239 (Sup. Ct Queens Co. May 12, 2005) to argue their position.  ADA Heather Marshall argued that the QDAO's should not be recused because there would be no conflict.

501.    In Leibovitz's reply, he disagreed with ADA Heather Marshall's assessment for the pure fact that Mr. Ward and Leibovitz have:

A.    Attacked the Queens County DA's Office multiple times on the record for using bullying tactics;

B.    Defendant PISCIONERE will testify in Leibovitz's favor and thus she should be disqualified from trying this case;

C.    Not only should Defendant PISCIONERE be recused but the QDAO should as well because Defendant PISCIONERE's conflict as a witness is imputed upon the entire office;

D.    The QDAO is covering up for the Queens Civil Court's employees during the criminal proceeding;

E.    QDAO investigation or lack thereof;

F.    Discovery:  Failure to comply with Court Orders;

G.    QDAO Prosecutorial Misconduct: Defendant PISCIONERE and supervisors;

H.    Leibovitz filed a grievance against Defendant PISCIONERE with the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts File No: Q-1271-14;

I.    Notice of claim has been filed with the city and Court of Claims.

## December 4th, 2014, QIDV- Calendar

502.    On December 4th, 2014, Mr. Ward's case was called on the QIDV calendar before Judge Gerald.

503.   Prosecuting on behalf of the People was Defendant STAINES.

504.   The following transpired:

   A.   The next return date was scheduled for February 4th, 2015, QIDV.

505.   Sometime in early December 2014, Mr. Ward reached out multiple times to Assistant District Attorney Daniel O'Leary ("ADA O'Leary") from the QDAO's Integrity Bureau expressing his concerns about the corruption in the QDAO.

506.   Sometime after December 30th, 2014 but before January 5th, 2015, Leibovitz received by mail the People's response to his demand for discovery.

507.   On January 12th, 2015, Leibovitz filed a motion for an order issuing a subpoena duces tecum with the NYS Unified Court System Office of Court Administration requesting original video footage, for the following dates:

   a. **Video Camera Footage:**
   **Date:** April 16th, 2014
   **Location:** Queens Civil Court located on 89-17 Sutphin Blvd, County of Queens, New York State 11435
   **Floors:** 1st, 2nd, 3rd and 4th floor
   **Duration:** 9:00 am - 4:30 pm

   **b. Video Camera Footage:**
   **Date:** April 16th, 2014
   **Location:** Queens Civil Court located on 89-17 Sutphin Blvd, County of Queens, New York State 11435
   **Floor:** 1st floor Inside Office (by main entrance and scanning machines where a holding cell exist and court officers are stationed by the window)
   **Duration:** April 16th, 2014, 9:20 a.m. to 11:59 pm

   **c. Video Camera Footage:**
   **Date:** July 7th, 2014

**Location:** Queens Civil Court located on 89-17 Sutphin Blvd,
County of Queens, New York State 11435
**Floor:** 3rd floor 1) Major Lowe's office Room 367
                 2) Deputy Barry's Office 361
                 3) by the 3rd floor elevators/ vestibule
                     hallways (Northwest Elevator)
**Duration:** July 7th, 2014   1:00 pm to 5pm

508.  With the People dismissing the original top count of Obstruction Governmental Administration in the superseding information on November 17th , 2014, on January 12th , 2015, Leibovitz filed another motion to dismiss.

509.  On information and belief, sometime in January of 2015, Defendant SCOTTO was assigned to prosecute both Mr. Ward and Leibovitz.

## January 20th, 2015, AP-1 Calendar

510.  On January 20th, 2015, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Donna Golia.

511.  Prosecuting on behalf of the People were Kevin Fogarty and Defendant SCOTTO.

512.  Both Mr. Ward and Leibovitz's legal advisors were present.

513.  The following transpired:
   A. Leibovitz stated on the record that he has approximately 11 outstanding motions and that the People still have not complied with both Mr. Ward and  Leibovitz's discovery demands;
   B. Judge Donna Golia ordered the People to comply with both Mr. Ward and Leibovitz's discovery demands by February 10th, 2015;
   C. The next Court date was scheduled for March 18th, 2015.

**February 4th, 2015, QIDV- Calendar**

514.   On February 4th, 2015, Mr. Ward's case was called on the QIDV calendar before Judge Gerald.

515.   Prosecuting on behalf of the People was Defendant STAINES.

516.   The following transpired:

    A.    The People informed the Court that they are ready for trial but they have "outstanding Rosario that we are trying to get a hold of"; The contradiction in terms here is noteworthy. They either had the Rosario material or they didn't. Exactly what did this Rosario material include; no clue is provided;

    B.    Defendant STAINES informed the Court that Mr. Ward has reached out to ADA O'Leary;

    C.    Mr. Ward served Judge Gerald with a copy of a summons and complaint;

    D.    Mr. Ward requested the assignment of an advisor at his initial appearance, but no advisor was assigned. The assignment of an official advisor would have enabled Mr. Ward to have subpoenas signed for the video cameras on the property, as well as the phone images and messages from Teresa Ward;

    E.    Mr. Ward once again requested that Judge Gerald set forth the motion for an investigator;

    F.    Judge Gerald stated that she will assign an 18 B lawyer;

    G.    Mr. Ward asked if there is a list for 18B lawyers and if the Judge can assign an 18 B lawyer, why can't she assign an investigator from a list the Court has;

    H.    Judge Gerald's reply is that they don't sit in the court rooms and are not available for case assignments;

    I.    Mr. Ward further stated that he spoke to one of the 18B detectives on the list and was informed that they are in fact available;

J.      In response to a request from Judge Gerald as to whether there is any more Rosario material, Defendant STAINES states that Defendant DIAQUOI as well as the memo book from the Police Officers who responded to the scene on April 3rd, 2014, are on funeral duty;

K.      Mr. Ward indicated that Teresa Ward handed him a letter establishing a fine of $12,000 for construction work on the house that she performed without obtaining a permit, and without his knowledge or consent as owner;

L.      The next return date was scheduled for February 18th, 2015, QIDV for the assignment of an 18B lawyer.

517.   On February 10th, 2015, the People failed to comply with the Court's Order to serve both Mr. Ward and Leibovitz with their discovery demands.

518.   Sometime in early February 2015, Leibovitz reached out multiple times to ADA O'Leary expressing his concerns about the corruption in the QDAO.

## February 18th, 2015, QIDV- Calendar

519.   On February 18th, 2015, Mr. Ward's case was called on the QIDV calendar before Judge Gerald.

520.   Prosecuting on behalf of the People was Defendant STAINES. The following transpired:

A.      Judge Gerald recused herself as a result of being a party in Mr. Ward's lawsuit that was filed back on January 6th, 2015 in Queens Supreme Court;

B.      Judge Gerald adjourned the hearing for March 18th, 2015 and Mr. Ward's case was assigned to AP4.

**March 18th, 2015   AP-1 Calendar**

521.   On March 18th, 2015, Leibovitz and Mr. Ward's case was called on the AP-1 calendar before the Honorable Judge Dibiase.

522.   Prosecuting on behalf of the People was ADA Kevin Fogarty.

523.   Both Mr. Ward and Leibovitz's legal advisors were present.

524.   The following transpired:

    A.   Judge Zayas's decision and order with regards to Leibovitz's motion to recuse the QDAO as well as Defendant PISCIONERE was served on both the People and Leibovitz;

    B.   Judge Zayas denied Leibovitz's motion;

    C.   Judge Dibiase put Leibovitz and Mr. Ward's case on for trial, April 17th, 2015;

    D.   Both Leibovitz and Mr. Ward protested that they still had outstanding motions pending before the Court.

**March 18th, 2015, AP- 4  Calendar**

525.   On March 18th, 2015, Mr. Ward's case was called on the AP-4 Calendar before the Honorable Michelle Armstrong.

526.   Prosecuting on behalf of the People was Defendant STAINES and Assistant District Attorney Margaret Chieu.

527.   The following transpired:

    A.   Judge Armstrong asked Mr. Ward if he will be making a motion for an advisor;

    B.   Mr. Ward explained that Judge Gerald transferred the case down to AP-4 so that he can be assigned an 18B lawyer, this after she recused herself;

71

C.     Mr. Ward handed Judge Armstrong the Third Party Complaint, that was before Judge Gavrin, Docket # 15208/13;

D.     Judge Armstrong stated " we are going to second call.";

E.     Defendant STAINES stated that "it is our position we don't need to recuse ourselves" (citing "Hendricks" ) "the defendant cannot articulate the actual prejudice" camera is (sic) defendant is alleging inoperable, she never took pictures. Had Mr. Ward been assigned an advisor at that time, any experienced counsel would have pointed out the fact that Defendant STAINES' statements were indicative proof of subornment of perjury, since she should have been aware of the fact that Detective DIAQUOI saw the pictures himself. That would produce "actual prejudice" forcing the QDAO to recuse itself.

F.     Defendant STAINES states that Mr. Ward is not allowed to contact her, but Mr. Ward did , and then states that she is handing over the rest of the Rosario;

G.     Once again, Defendant STAINES is committing self-serving error. Mr. Ward was a pro se Defendant, giving him the same rights to contact the ADA as an attorney representing him would have;

H.     The People offered Mr. Ward "an ACD and a full order of protection" for which he respectfully declined;

I.     Judge Armstrong adjourned the hearing for April 17th, 2015 in order to procure a legal advisor for Mr. Ward.

528.    On March 27th, 2015, Leibovitz placed a call to Defendant BARRY's office and a dialogue ensued.

529.    Leibovitz was informed by Defendant BARRY that as of last week, the third floor cameras in Queens Civil Court "are now up to speed" but Defendant BARRY was unsure if all the other cameras in Queens Civil court were operating.

530.    With surveillance cameras not operating on the third floor on April 16th, 2014 and July 7th, 2014, court officers were free to act with impunity.

531.    On March 30th, 2015, Leibovitz filed a lawsuit in the Eastern District Court of New York to run concurrently with his criminal proceeding in order to put an end to the malicious prosecution, put defendant CITY and the QDAO on notice and finally in order to conduct a more extensive discovery.

532.  Leibovitz strategically omitted in his pleadings what exactly happened on April 16th, 2014 while Mr. Ward and Leibovitz were in the anteroom with defendant BENNETT.

533.  Upon filing the lawsuit, Leibovitz served the Queens Criminal Court and the QDAO a hard copy.

## April 17th, 2015, AP-4 Calendar

534.  On April 17th, 2015, Mr. Ward's case was called on the AP-4 Calendar before the Judge Armstrong.

535.  Prosecuting on behalf of the People were Defendant STAINES.

536.  The following transpired:

> A.  Judge Armstrong adjourned the hearing for May 21st, 2015.

537.  On April 17th, 2015, Judge Armstrong granted Mr. Ward and Leibovitz's request for an adjournment and rescheduled their bench trial for May 4th, 2015.

538.  On or about April 23rd 2015, Mr. Ward was able to acquire the audio transcript for the hearing that was conducted on April 16th, 2014 in Queens Civil Court, Room 406D before Judge Landson.

539.  On April 23rd, 2015, Leibovitz emailed Mr. Ward, Defendant SCOTTO, Judge Armstrong's Court attorney Ms. Gamble, Mr. Fox and Mr. Gargiulo stating the following:

> Good Afternoon everyone:
> The following is the list of Queens Civil Court Staff as well as a way to get a list of civilian witnesses that were present in Queens Civil Court on April 16th, 2014.
>
> Queens Civil Court Staff:
> Major:
> 1. Major Lowe
>
> Lieutenants:
> 1.  3 Lieutenants (a) O'Brien (b) Unknown male  (c) Unknown

Court Officers:
1. Marie Bennett
2. Shield # 6814
3. Shield # 3814
4. Shield #7910
5. Shield # 6710
6. Shield # 6684  ******  Not 100 Percent sure the shield number is correct
7. John Does  and Jane Does # 1-16


Civilian Witnesses: April 16th, 2014,   4th Floor Rooms 403, 402 and 401

Room 403 Civil Court
Room 402  Housing Court Part A  and B
Room 401 Resolution Court Part A

It appears that each of the  aforementioned  courtrooms has a calendar list per day.  Mr. Ward and I would like the names of all the patrons for that day. This could be easily accessed and produced since this should be stored on the Civil Court server database.

Mr. Ward and I were both in Civil Court today.  We noticed that each elevator has a camera.  On April 16th, 2014 Mr. Ward and I as well as the officers took Cart #1.  We will need also the video surveillance for that day.


Thanks Mr. Leibovitz

540.    On April 23rd, 2015, Defendant SCOTTO responded to Leibovitz's email stating the following:

Mr. Fox and Mr. Garguilo,

This list is well beyond the scope of what was requested by Judge Armstrong.  Please see my email from yesterday.  I will provide that information, as well as any of the additional court officers whose badge numbers were provided today.   All together, there should be approximately 10 people on the list from the court officers.

I will not be chasing anyone named John Doe.  I will not go out and get a list of civilian witnesses or any court staff.

I have been told repeatedly that there is no relevant video.

I will do my best to turn over the list by early next week, but that is dependent on the court officers. We are shooting for 5/4 to meet and watch the video on the phone.

If there are any other issues, feel free to advance the case and make a record in court.

Best,

Jared Scotto

541. On April 23rd, 2015, Leibovitz responded to Defendant SCOTTO's email. Leibovitz response email was sent to Mr. Ward, Defendant SCOTTO, Ms. Gamble, Mr. Fox and Mr. Gargiulo.

Good morning P Gamble,

After reading Mr. Scotto's last email and his abject failure to entertain even the most basic and entirely reasonable request from both Mr. Ward and I with regards to providing a list of the names of civilian witnesses (contact information) and court staff is both shocking and troubling to both Mr. Ward and I. Such a request hardly requires a herculean effort to honor considering that the day of incident (April 16th, 2014), time , location (3rd and 4th floor) and courtrooms (Rooms 401, 402, 403, 405, 406, 407) are identified and known. As I stated previously in the last email, we all know in Queens Civil Court as well as in Queens Crimina Court, a Court's calendar schedule is posted everyday outside the rooms with the list of plaintiffs and defendants as well as lawyers. Running a query on the Queens Civil Court's computer database should not be that difficult. Mr. Scotto has no good faith basis for refusing both Mr. Ward and my request to procure both the names of civilian witnesses (contact information) and court staff. If the aforementioned witnesses' would help the People's cause we all know that they would be procuring every witness possible. Furthermore, last week on April 17th, 2015, while on the record the Honorable Judge Armstrong ordered the People to provide us the aforementioned request. From inception of this criminal matter, the People have refused to comply with the Court's Orders to provide Mr. Ward and I with discovery, Brady Material, and now Mr. Ward and I have to deal with this.

Thanks for your time,
Have a great weekend
Mr. Leibovitz

542.    Sometime between April 23rd and May 4th, 2015, Mr. Ward and Leibovitz met and conferred with their legal advisors Mr. Fox and Mr Gargiulo and with each other to strategize how they were going to present their case in chief.

543.    On May 3rd, 2015, Defendant SCOTTO filed reciprocal discovery and served both Mr. Ward and Leibovitz.

544.    On May 4th, 2015, Leibovitz's phone that was used to record the April 16th, 2014 incident was released and returned back to Leibovitz. Leibovitz provided Defendant SCOTTO a hard copy.

545.    On May 4th, 2015 Judge  Armstrong advanced Mr. Ward and Leibovitz's case for May 8th, 2015.

## Mr. Ward and Leibovitz's Bench Trial May 8th – May 12, 2015

546.    On May 8th, 2015, a bench trial was held before Judge Armstrong.

547.    Prosecuting on behalf of the People was Defendant SCOTTO.

## Defendant BENNETT's Direct Examination

548.    Defendant SCOTTO called Defendant BENNETT as his first witness.

549.    During direct examination, Defendant BENNETT testified to the following:

   A.  Defendant BENNETT testified that Leibovitz upon entering Courtroom 406D, "came in flying into the courtroom" and "caused the door to fly open and hit the wall behind it then he blurted out "why is she [Teresa Ward] leaving";

B. Defendant BENNETT further testified that she stated to Leibovitz that he needed to calm down and to have a seat because Leibovitz was loud and his behavior was inappropriate for the courtroom. He didn't walk in calmly, he walked in abruptly;

C. Defendant BENNETT testified that her voice didn't escalate when Mr. Ward asked for her shield and name;

D. Defendant BENNETT testified that she informed Leibovitz to erase the recording once Mr. Ward and Leibovitz stepped out of the anteroom and into the hallway;

E. Defendant BENNETT testified that a crowd started to develop on the outside of the elevator bank, approximately 18 people;

## Mr. Ward's May 8th, 2015 Cross-Examination of Defendant BENNETT

550.   On May 8th, 2015, Mr. Ward cross examined Defendant BENNETT in attempt to introduce as an exhibit the Courtroom recording of the audio minutes from April 16th, 2014, inside Queens Civil Court, courtroom 406D, where Defendant BENNETT was stationed. The following examination and testimony is provided in part:

| | |
|---|---|
| Q | In this courtroom the minutes are recorded on audiotape, correct? |
| A | That's correct. |
| Q | And the audiotape is continuously on? |
| A | Some judges turn them off between cases, some do not. |
| Mr. Ward: | Your Honor, again, I would like to put in as an exhibit my tape from the date in reference inside courtroom 406B where Marie Bennett, Officer Marie Bennett was stationed. |
| Mr. Scotto: | Objection. |
| The Court: | You haven't laid a proper foundation for that evidence at this point so I have to — |
| Mr. Scotto: | I haven't heard it either. |
| The Court: | I have to sustain and he hasn't heard it. The objection is sustained. |
| Mr. Ward: | Your Honor, I would like to readdress that. This is probably the most |

important piece of evidence.

The Court:   I didn't say you wouldn't get it, I just said you haven't laid the foundation yet so in the meantime continue your cross-examination and we will recess so Mr. Scotto will have an opportunity to hear it.

**The balance of Mr. Ward's cross-examination of Defendant BENNETT is not included because the answers were not relevant to the issues stated herein.**

## Leibovitz's May 8th, 2015 Cross-Examination of Defendant BENNETT

551.   When Mr. Ward completed his cross examination of Defendant BENNETT, Judge Armstrong inquired if Leibovitz is prepared to cross examine the witness.

552.   Leibovitz approaches the lectern and implements his game plan.

553.   Leibovitz opens up his cross examination of Defendant BENNETT focusing his attention on getting her testimony as to what transpired when both Mr. Ward and Leibovitz exited room 406D, specifically while in the anteroom.

554.   Exiting courtroom 406D requires opening the exit door entering the anteroom and then another door to enter the hallways.  Defendant BENNETT testified to the following:

> **Q**    Upon the transition from the first door exiting the courtroom to then the second
> door which allows you to exit into the hallways, isn't it true you said you want
> to leave out in handcuffs?

> **A**    **No, I did not say that.**

555.   In ensuing cross-examination, Leibovitz asked Defendant BENNETT the following:

> **Q**    If you were so concerned for the public wouldn't you arrest them right away?

**A**    The concern was the recording device.  If you had complied with our instructions to stop recording, to erase the recording, if you complied with our orders to do so, you would not have been arrested as far as I understand.

**(Immediately Defendant SCOTTO slapped himself in the face and shook his head.)**

556.    Yet, at the time of the incident on April 16, 2014, New York State and the QDAO had not yet set the policy of barring such recordings, no signs barring same were displayed until approximately 4 days later, and the policy directive itself was not issued for another 2 months. When Leibovitz and Mr. Ward were being detained on the third floor outside room 367, they were officially arrested, according to Defendant BENNETT for recording, yet, Mr. Ward was not, himself, recording anything. This makes the arrest of Mr. Ward unlawful by Defendant BENNETT's own expressed admission, and makes Leibovitz' arrest unjustified because the policy was not disclosed nor in effect on that date.    Further, Defendant BENNETT blatantly committed perjury when she accused Leibovitz and Mr. Ward of creating a scene on the fourth floor in  front of the elevators. The recording clearly indicates that there was no crowd there and evinces no sound of any sort or kind that a reasonable person would be able to hear if a loud scene was in process. Therefore, no basis existed for the charges of Disorderly Conduct which were included in the Superseding Information.

## May 11th , 2015 Defendant BENNETT Commits Perjury

557.    On May 11, 2015, Judge Armstrong addressed Mr. Ward's request to admit the Courtroom tape as evidence.  The following colloquy ensues:

> **The Court:** Okay.  Whether or not the tape comes in – whether or not this video come in, I have to permit redirect and cross. She (Defendant BENNETT) should come over anyway.
>
> **Mr. Scotto:** I will have somebody bring her over.  So about the tape?
>
> **Mr. Leibovitz:** Your Honor —
>
> **Mr. Ward:** Your Honor, I'd like to have this marked for identification.
>
> **The Court:** Have the People had an opportunity now to review the tape?

**Mr. Scotto:** Very briefly, Judge, very briefly. It was given to me this morning. They gave me a copy of their copy. It's the minutes that—it's basically background noise picked up in the courtroom while Mr. Ward's case—the day Mr. Ward's case was on the record. The actual disk they got from the court is about an hour long and it's snippets of what they want to use, about five minutes. I had a chance to listen to those. I'm going to ask for preclusion based on their failure to disclose this during the discovery process. I served reciprocal discovery demands on the defendants in court last week with regard to any video recording they intended to use at trial that specific—

**The Court:** This is a video or an audio?

**Mr. Scotto:** What they gave me is a video of the audio. They basically played it on the computer and then shot a video of it with some kind of recording device in order to pick up the sound. It's not authenticated, it's not certified, that's a separate issue. Where is this coming from?

**Mr. Ward:** Your Honor, any objection should go to weight and not admissibility. Your Honor, I have here the envelope in which I went to Civil Court on Sutphin Boulevard to the third floor's clerk's office where I ordered the minutes that the clerk sent to me at my home address.

**The Court:** So this is of the court proceeding of your case—

**Mr. Ward:** On April 16th, 2014, inside Room 406, I believe it's B. This is the original minutes give to me by the clerk of the court sent to me in the envelope, addressed to my home.

I gave Mr. Scotto this recording this morning and stated that this is copyrighted and cannot be copied at all. Therefore, using the resources we had, which is a cell phone, we played the original CD on the computer and used the cell phone to record it so that we could give Mr. Scotto a copy of the minutes, as well as allowing him to have access to the CD at hand. Your Honor, as well, one appearance prior to last Friday, Mr. Scotto's statement – may I go back, Your Honor?

Both Mr. Leibovitz and I put in discovery demands requesting this information and the minutes from the proceeding and the minutes from the proceeding in Room 406B from the People.

**Mr. Scotto:** *And we were directed not to provide that.*

**Mr. Ward:** Your Honor, one appearance prior to Friday Mr. Scotto stated—

**The Court:** Let me ask you this: What is it that's on that audio recording, correct?

**Mr. Ward:** Yes, Your Honor.

**The Court:** What is it that's on it that you are seeking to introduce at the trial? Just tell me.

**Mr. Ward:** Your Honor, it shows my appearance in front of the housing court judge at 9:49. So from 9:49 it shows an accurate and fair representation of my appearance and it rebuts Marie Bennett's testimony.

**The Court:** What's on there that does that, that's what I am asking? Can you hear people speaking?

**Mr. Ward:** There is a clear statement of Marie Bennett threatening both Mr. Leibovitz and I to leave in handcuffs, Your Honor, which she testified she never threatened us.

**The Court:** Is there anything else on there? Did you hear that Mr. Scotto?

**Mr. Scotto:** It's very low. Yes, I did hear it, Judge.

**Mr. Ward:** Also, it shows various other instances that show Ms.— Officer Marie Bennett's testimony is inaccurate with – in accordance of asking the judge if I can leave. It shows Mr. Leibovitz's demeanor and that he didn't—

**The Court:** You can hear Mr. Leibovitz on the tape?

**Mr. Ward:** Yes, Your Honor. You can both hear Mr. Leibovitz clearly, as well as you can hear my voice accurately and clearly, Your Honor.

**The Court:** All right. And  so you are seeking—so this is as it's happening, it's being recorded; is that my understanding of the audiotape?

**Mr. Scotto:** I have a bunch of  different parts==

81

**Mr. Ward:** Yes, Your Honor.

**Mr. Scotto:** I'm seeking preclusion based on failure to disclose on discovery grounds. I think that it's really trial ambush. I didn't have a chance to review this with my witness before she testified. It's a statement that the defendant are saying that she made. I did not have a chance to ask her about it. Now I'm getting it before I redirect my witness.

**Mr. Ward:** Your Honor, previous to last Friday's appearance in front of you, Mr. Scotto's – after both Mr. Leibovitz and I asking Mr. Scotto for the discovery demands, Mr. Scotto says—said that both Mr. Leibovitz and I had access to go to the Courts and get the information for ourselves.

**The Court:** So on that point, I'd have to agree with Mr. Ward, in that you both had access to the information and you were on notice that it existed. It could have been ordered by subpoena duces tecum.

**Mr. Scotto:** That's perfectly fine, Judge, I understand that, but in response to that, they had it and didn't turn it over. That's what I mean – sure I could have---

558. The following examination was given by Mr. Ward and testimony was provided by Defendant BENNETT in part:

Q   Good afternoon, Officer Bennett.

A   Good Afternoon.

Q   Officer Bennett, are you aware that there is audio recordings of the minutes in Queens Civil Court, Room 406?

A   I am now.

Q   Previously you stated that you were aware of the recording by the judge and that some judges leave the audio recording on to continue throughout the day, and some judges stop it throughout the day, and some judges stop it throughout the periods of each case; is that correct?

A   Yes.

Q   Are you aware that all ambient discussions in the courtroom may be recorded as well?

A     Yes. If a judge leaves a recording on, yes.

Q     Did you hear the audiotape identified and marked by the defense as Exhibit A?

A     Yes

Q     Did you recognize your voice?

A     Yes, I did.

Q     Did you recognize Mr. Leibovitz's voice?

A     It sounded like him, yes.

Q     Did you recognize my voice?

A     Yes?

Q     Do you believe the audiotape that you just heard to be a fair and accurate representation of what transpired in Room 406 on April 16th, 2014?

A     **I believe the audio speaks for itself.**

| | |
|---|---|
| **Court:** | I need an answer to that question. |
| **The Witness:** | Yes |
| **Mr. Ward:** | Your Honor, at this time  I'd  like to mark this recording as Defense Exhibit A |
| **Mr. Scotto:** | Objection.  That's not what Office Bennett heard previously. |
| **The Court:** | That's my question.  What's been previously marked Defendant's A for identification, that's the tape you are moving into evidence, correct? |
| **Mr. Ward:** | Yes, Your Honor. |
| **The Court:** | Any objection to that? |
| **Mr. Scotto:** | Not yet |
| **The Court:** | This is the time. |
| **Mr. Scotto:** | I mean, I do have an objection. |
| **The Court:** | Other that what you have already stated? |
| **Mr. Scotto:** | Other than what I have previously stated.  I believe that this |

is unauthenticated on a disc, and also the copy that was turned over to me, the copy that Officer Bennett listened to and the copy the defendant just said he seeks to introduce into evidence also should be excluded under double

,

hearsay,

Mr.

Judge, because this is a video of the audio recording that Leibovitz and Mr. Ward got from the Court. That, on its own, would have to be authenticated, and I don't believe there is a second hearsay exception for which that falls into.

**The Court:**   The tape will be received into evidence as Defendant's Exhibit A. That is the tape that the witness just indicated fairly and accurately transpired on that day. Move on to your next question.

**BRIDGE OFFICER:** So moved.

**Q**      Officer Bennett, on that audio there is a statement that you made saying that – asking both Mr. Leibovitz and I if we wanted to leave the courtroom in handcuffs; is that correct?

**A**  Yes.

559.   On May 11, 2015, Leibovitz cross-examined Defendant BENNETT. Defendant BENNETT testified to the following:

**Q**      On Friday you testified that you didn't threaten Mr. Ward or Mr. Leibovitz
        with handcuffs, correct?

**A**      Correct

**Q**      Now, isn't it true that you heard on the tape that you – that in actuality you

        did?

**A**      I don't consider what I said a threat.

**Q**      Excuse me?

**A**      I don't consider what I said a threat.

**Q**      Excuse me?

84

560.    On May 11, 2015, Leibovitz further cross examined Defendant BENNETT. Defendant BENNETT testified to the following:

> **Q**      On Friday you testified that you didn't mention handcuffs, but that's not the truth, correct?
>
> **A**      No, On Friday, yes, I did not recall saying the handcuffs, that's true.
>
> **Mr. Leibovitz:** No further questions, Your Honor.

561.    It is blatantly clear that Defendant BENNETT deliberately perjured herself with her testimony about what occurred while she, Leibovitz and Mr. Ward were still in the Courtroom. With complete collusion on the part of Defendant SCOTTO, Defendant BENNETT submitted a version of the events in the Courtroom that were a total figment of her vivid imagination. It is perfectly clear from the Courtroom recording that a) Leibovitz did not enter the Courtroom in the manner that Defendant BENNETT described b) that Defendant BENNETT never instructed Leibovitz to "calm down" c) that Defendant BENNETT displayed clear bias towards her female counterpart, Teresa Ward, in politely inviting her to leave of her own accord without any effort or attempt to see that she actually departed the Courthouse, and d) that Defendant BENNETT first harassed Mr. Ward before egregiously exacerbating the matter by threatening to take both Leibovitz and Mr. Ward out in handcuffs.

562.    Defendant SCOTTO quite obviously suborned what he should have known to be perjured testimony by Defendant BENNETT as he had continuous access to the Courtroom recording in the months leading up to the trial, and specifically stated during testimony that "*And we were directed not to provide that*" after Leibovitz and Mr. Ward repeatedly requested the Courtroom recording as part of discovery. His objection that this represented "trial by ambush" was a poorly disguised attempt to cover-up his misjudgment as to what Leibovitz and Mr. Ward might be able to bring to the Court as clear evidence of misconduct, having gambled incorrectly that he and Defendant BENNETT would not be caught in the act of committing and suborning perjured testimony. The origin of this activity can be traced

85

directly back to higher-ups in the QDAO, such as Defendant HERRING, who are responsible for setting office policy. That establishes this unlawful behavior as a Monell violation.

## May 21st, 2015, AP- 4 Calendar

563. On May 21st, 2015, Mr. Ward's case was called on the AP-4 Calendar before Judge Armstrong.

564. Prosecuting on behalf of the People was Defendant STAINES.

565. The following transpired:

A.    Judge Armstrong adjourned the hearing for July 1st, 2015.

566. On June 10th, 2015, Mr. Ward was acquitted and Leibovitz was found guilty of one count of Disorderly Conduct, N.Y. Penal Law § 240.20 (2). Sentencing was scheduled for November 13, 2015.

## July 1st, 2015, AP- 1 Calendar

567. On July 1st, 2015, Mr. Ward's case was called on the AP-1 Calendar before Judge Armstrong.

568. Prosecuting on behalf of the People was Defendant STAINES.

569. Mr. Ward's legal advisor Mr. Fox was present.

570. The following transpired:

A.    Defendant STAINES conceded that Mr. Ward provided her video tapes of Defendant DAIQUOI conversing with him on April 8th, 2014;

B.    Defendant STAINES requested an adjournment for two weeks in order to investigate the "material";

C.    Mr. Ward's case was on for trial;

D.      The People offered Mr. Ward "an ACD and a full order of protection";

E.      Judge Armstrong inquired if Mr. Ward is declining that offer for Mr. Ward stated in part, "Absolutely, Your Honor , Absolutely;

F.      The following colloquy ensued:

**Mr. Ward:** There is also audio of 911 calls made by me with Mr. Leibovitz as a witness. I also turned them in on the same disk as the full conversation with Detective Daiquoi. I have two judicial subpoena I would like to have signed. I have a judicial subpoena for a phone.

**Judge Armstrong:** For what phone?

**Mr. Ward:** Ms. Rodriguez's (Teresa Ward's) phone. It clearly states on the audiotape between the Detective Diaquoi and I that he seen the pictures and he knows that I wasn't there. He seen her pictures and he knows I wasn't there.

**Ms. Staines:** Your Honor, if I may, I have not had time to investigate the audio recording to verify with Detective Daiquoi what he saw, what he didn't see, anything like that. As far as any subpoenas for the complainant's phone, I would ask that you not sign those until we can figure this out, especially because I believe that the defendant right now is on a fishing expedition to get records from the complainant's phone for their divorce action, their housing court action and other court action.

**Judge Armstrong:** I guess my question is why do you believe there is anything on the phone?

**Mr. Fox:** The phone is relevant, Your Honor. This is a photo handed over to --

**Judge Armstrong:** I remember that.

**Mr. Fox:** Apparently, this is the moment she is taking photos of Mr. Ward and serving the subpoenas – Mr. Leibovitz and then running down the block and taking pictures of Mr. Ward allegedly when he is not supposed to be near there, in violation of the order. The prosecution has stated that – she says she is – has

nothing on her phone. On the recording, the detective says, "I have seen the pictures. You are not on there." I heard that recording. We have handed that over two weeks ago. So a subpoena for the phone—

**Judge Armstrong:** Where is the phone?

**Ms. Staines:** Your Honor, I don't know if the complainant has the same phone. I don't know what number she was using at the time. I could find out for you, if you like, but this case is over a year old, so I don't know. And it is my position – and I have spoken to the complainant numerous times about those photos, that there are no photos and they don't exist.

**Judge Armstrong:** What is that photo?

**Ms. Staines:** That was a photo of her holding up her phone. Whether she took a picture or not – I have spoken to the complainant about it. It is in my motion pictures. She said she never took a picture. I have not been able to speak and investigate whether the detective saw any pictures, or if he was referring to those pictures.

**Judge Armstrong:** Okay. This is not something we are going to resolve here. What I will do is direct the People to meet with the complainant and look at the phone and preserve any photographs that are on the phone that are relative to the charges pending, if there are. I don't know that there are.

**Ms. Staines:** Absolutely, Your Honor. And I have spoken with her at length and I was repeatedly told that there were no pictures.

**Mr. Fox:** All right. But whether you will - - she can speak to the detective who said, " I saw the pictures. You are not on them."

**Judge Armstrong:** Well, you are going to have to resolve what pictures you're referring to. It's nothing I can resolve here, so you are going to have to work outside of court.

**Ms. Staines:** That's why I requested two weeks.

> **Mr. Ward:** Your Honor, the detective stated that he seen the pictures of the server, Mr. Leibovitz, and he knows that I was nowhere near.
>
> **Judge Armstrong:**  Hopefully he will say that again when he is in court.

    G.     Judge Armstrong adjourned the hearing for July 30th, 2015.

## July 30th, 2015, AP- 4 Calendar

571.    On July 30th , 2015, Mr. Ward's case was called on the AP-1 Calendar before the Judge Armstrong.

572.    Prosecuting on behalf of the People was Defendant STAINES.

573.    Mr. Ward's legal advisor Mr. Fox was present.

574.    The following transpired:

        A.     Judge Armstrong adjourned the hearing for October 3rd, 2015.

575.    On October 1st, 2015, Leibovitz wrote a letter to Judge Armstrong stating in part:

> On September 28, 2015, in Queens Criminal Court, when my case was called on the AP-2 Calendar before you I stated in part "I also wanted to point out [today] what is going to happen [to Marie Bennett], I reached out to Mr. Scotto multiple times via email to address [this issue], both Mr. Ward and I are concerned that the ADA has not prosecuted Marie Bennett for perjury. You responded in part "I understand that but I have no jurisdiction over that". On that day you failed both Mr. Ward and I, and especially the general public, by not taking appropriate action by reporting ADA Jared Scotto, who has committed a substantial violation of the Code of Professional Responsibility. Please see below the following Judicial Canons you violated. At my next appearance, slated for November 13, 2015, I do

hope when I pose the same question again that you will inform the People and I that you have taken appropriate action by reporting Mr. Scotto to the appropriate agency, Second Department Grievance Department, (ask for Deputy Counsel Mark Dewan (718) 923-6300) pursuant to Canon 100.3 (D)(2).

## October 3rd, 2015, AP- 4 Calendar

576.   On October 3rd, 2015, Mr. Ward's case was called on the AP-1 Calendar before Judge Armstrong.

577.   Prosecuting on behalf of the People was Defendant STAINES.

578.   Mr. Ward's legal advisor Mr. Fox was present.

579.   The following transpired:

  A.   Judge Armstrong adjourned the hearing for October 30th, 2015.

580.   On October 29th, 2015, Leibovitz emailed Defendants SCOTTO and PISCIONERE. Both Mr. Fox and Mr. Gargiulo were included in the email thread. Leibovitz wrote the following:

Mr Scotto,

I just called and spoke to your "supervisor" Mr Catarisand at (718) 2866972 I have given him notice to investigate what Mrs Piscionere has done as well as you with regards to pretrial violations and bench trial violations of due process. Mr Scotto, you still have not responded and informed me who is "we" when you state on May 11, 2016 ( I have provided your office a copy of the minutes you will soon get served with the 330.30 motion still need to print it out- limited funds) that we were instructed not to provide that?  Then you file reciprocal discovery to see I f we had it so you can see if you can allow your witness to commit perjury to say that I flew into the court room and was loud.  Then she testifies that she never threatened Mr Ward and I with handcuffs.  You have an incredible witness.

See you in federal court.  I am now calling the city corporate office.

See you tomorrow

Mr Leibovitz

## October 30th, 2015, AP- 4 Calendar

581.   On October 30th, 2015, Mr. Ward's case was called on the AP- 4 Calendar before Judge Armstrong.

582.   Prosecuting on behalf of the People was ADA Rob Rodgers.

583.   Mr. Ward's legal advisor Mr. Fox was present.

584.   On October 30th, 2015, the criminal charges against Mr. Ward arising from the April 3rd, 2014 incident were finally dismissed in Mr. Ward's favor.

585.   On January 19th, 2017, Mr. Ward composed an extensive 17 page letter addressed to Defendant STAINES.  The letter contained the sequence of events leading up to his I-Card arrest. The letter also included exhibits: a CD with various photos of Teresa Ward being served by Leibovitz; Mr. Ward's 911 call to the police on April 3rd, 2014; Mr. Ward's audio/video recording of his conversation with Defendant DIAQUOI on April 8th, 2014. Mr. Ward concludes his letter stating in part:

> I am requesting that based upon the above information,  that Teresa Ward be prosecuted pursuant to Article 210 section 210.45, to the full extent of the law.  Furthermore, I am requesting that your office investigate all prior complaints filed by Teresa Ward.

586.   Mr. Ward's letter was CC'ed to the following people:

> DA Richard Brown (*via* mail)
> ADA Angela Harper (*via* email and mail)
> Department of Justice (*via* mail)
> NYC Corporation Counsel, Eviana Englert, esq. (*via* email and mail)
> William Viscovich, Supreme Court Justice, (*via* email and mail)
> Michelle Armstrong, Queens Criminal Court Judge, (*via* mail)
> Lana Kleinman, esq NYLAG
> Pam Wexler, esq NYLAG

587.    As of today April 15th, 2017, it would appear that no action whatsoever has been taken to investigate and prosecute those violating and committing criminal offenses against the People of New York. The corruption in the New York City justice system, particularly the Queens District Attorney's Office, has become rampant and uncontrolled. If some action is not taken, this situation will eventually become accepted practice, and citizens of New York will have no expectation of receiving a fair and just hearing when they are accused, often without basis, of a criminal offense.

## FIRST CAUSE OF ACTION

(42 U.S.C. § 1983/ Fourth and Fourteenth Amendments;
Against Defendants Lowe, Rossi and Bennett)

---

588.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

589.   Plaintiff advances this claim against Defendants LOWE, ROSSI and BENNETT.

590.   By reason of the foregoing, and by arresting Plaintiff without probable cause, Defendants LOWE, ROSSI and BENNETT deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States and secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution to be free from false arrest and false imprisonment.

591.   By reason of the foregoing, Defendants LOWE, ROSSI and BENNETT, acting intentionally, maliciously, and without justification or probable cause, caused accusatory instruments to be filed and otherwise brought criminal charges against Plaintiff, who was held in Department of Correction's custody. The Plaintiff was exonerated of all charges after a bench trial.

592.   The wrongful, unjustifiable, and unlawful apprehensions, arrests, detentions and imprisonment of Plaintiff were carried out without a valid bench warrant, without a valid misdemeanor warrant, without his consent, and without probable cause or reasonable suspicion.

593.   The forcible stop, arrest, detention and imprisonment, Defendants LOWE, ROSSI and BENNETT, acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment as Major, Lieutenant and  Court Officer. Defendants LOWE, ROSSI and BENNETT, acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These defendants acted willfully,

knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

594.   As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

595.   As a result of Defendants LOWE, ROSSI and BENNETT's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and physical harm.  Accordingly, the Plaintiff demands judgment against Defendants LOWE, ROSSI and BENNETT in a sum of money to be determined at trial.

## SECOND CAUSE OF ACTION

(42 U.S.C. § 1983; Denial of Due Process And A Fair Trial
Under the Fifth, Sixth and Fourteenth Amendments;
Malicious Prosecution, Deprivation of Liberty, Subornation of Perjury,
Spoliation of Evidence, Conspiracy
Under the Fourth, Fifth, Sixth and Fourteenth Amendments;
Against Defendants Herring, Piscionere, Scotto, Barry, Lowe, Rossi and Bennett)

596.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

597.   Plaintiff advances this claim against Defendants HERRING, PISCIONERE, SCOTTO, BARRY, LOWE, ROSSI and BENNETT.

598.   Defendants HERRING, PISCIONERE, SCOTTO, BARRY, LOWE, ROSSI and BENNETT working in concert knowingly and willingly manufactured, false and fraudulent

charges with the objective of procuring an unlawful conviction of Plaintiff and Leibovitz.

599.   These illegal and unconstitutional means included, but were not limited to,

   a) Abusing judicial process by causing state actors to deliberately provide false and misleading testimony in order to try and justify an unlawful arrest and confinement;
   b) Colluding with each other to suborn false and perjured testimony from state actors;
   c) Colluding with each other to spoliate critical material that would have acted as exculpatory evidence, in order to falsely and unlawfully procure a conviction;
   d) Misleading the Court by throwing out false accusations of "trial by ambush" and creating further false accusations of creating a public disturbance in order to justify a fake disorderly conduct charge;
   e) Deliberately and with malice aforethought dismissing the top charge in order to deprive Leibovitz and Mr. Ward of a jury trial;
   f) Deliberately withholding and concealing Brady and Rosario material;
   g) Establishing a discriminatory policy of confiscating the phones of Leibovitz and Mr. Ward to the absence of all others, for the sole purpose of harassment.

600.   These lawless actions foreseeably caused Defendant BENNETT to manufacture false evidence which Defendants HERRING, SCOTTO and PISCIONERE then used to continue Plaintiff's malicious prosecution, without probable cause, and to bring about a bench trial.

601.   By filing reciprocal discovery at the last minute prior to the bench trial, Defendant SCOTTO's intent was to find out if the Plaintiff and Leibovitz had the April 16th, 2014, Courtroom 406D audio recording. If, in fact, they had not gained possession of the recording, BENNETT could say anything under oath that her vivid imagination could conjure without fear of having her testimony impeached as false and fraudulent. This would allow Defendant SCOTTO to please his superiors with double convictions.

602.   The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

   a. Not to be arrested, prosecuted, detained, based on false, fabricated, manufactured and misleading statements in violation of the Due Process

Clause of the Fifth and Fourteenth Amendments to the United States Constitution;

b. Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

c. To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

d. Denial of a fair trial by jury in violation of Plaintiff's Sixth Amendment rights under the U.S. Constitution, by virtue of the arbitrary dismissal of the top charge and substitution of additional fake and fraudulent charges for Disorderly Conduct, resulting in a bench trial.

603.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants caused the initiation and continuation of Plaintiff's malicious prosecution without probable cause, a bench trial, his loss of liberty and detention, with bail set at $1,000 and other injuries and damages.

604.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants' official duties and authority.

605.    Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently and with deliberate indifference to Plaintiff's constitutional rights to or to the effect of such misconduct upon Plaintiff's constitutional rights.

606.    By reason of the foregoing, Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## THIRD CAUSE OF ACTION

(42 U.S.C. § 1983; First Amendment Violation;
Against Defendants Lowe, Barry and Bennett)

607.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

608.   Plaintiff advances this claim against Defendants LOWE, BARRY and BENNETT.

609.   Defendants LOWE, BARRY and BENNETT committed the foregoing violation of Plaintiff's rights knowingly, intentionally, willfully, recklessly and with deliberate indifference to Plaintiff's constitutional rights to or to the effect of such misconduct upon Plaintiff's constitutional rights.

610.   The policy established through the actions of the New York State Unified Court System, through Defendant Barry, in setting a new policy regarding the use of recording devices in the Courtrooms of Queens County, was not put in place until June of 2014, two months after the incident pertaining to this case occurred. Even the 4 foot signs advising court patrons regarding the use of such devices, were not put in place until several days after the incident. Accordingly, the actions taken on April 16, 2014 by Leibovitz and Plaintiff were completely lawful as of that date, and the arrests represented a violation of their rights to free speech under the First Amendment of the U.S. Constitution.

611.   The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants' official duties and authority.

612.   Defendants committed the foregoing violations of Plaintiff's rights knowingly,

intentionally, willfully, recklessly, negligently and with deliberate indifference to Plaintiff's constitutional rights to or to the effect of such misconduct upon Plaintiff's constitutional rights.

613.    By reason of the foregoing, Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## FOURTH CAUSE OF ACTION

### DEPRIVATION OF RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDEMENTS AND 42 U.S.C. § 1983
### FAILURE TO INTERVENE
(Against State Defendants)

614.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

615.    Plaintiff advances this claim against State Defendants: Defendants O'BRIEN, CANNON, ESPOSITO, VASQUEZ, SUMOWSKI, KAHN, FALCO, WILSON, BRUNO, John and Jane Doe #1-5.

616.    State Defendants had an affirmative duty to intervene on the Plaintiff's behalf to prevent the violation of his constitutional rights.

617.    State Defendants failed to intervene on Plaintiff's behalf in order to prevent the violation of his constitutional rights despite having a realistic opportunity to do so.

618.    State Defendants failed to intervene on the Plaintiff's behalf in order to prevent the violation of his rights despite having contributed to the circumstances within which the

Plaintiff's rights were violated by Defendants LOWE, BENNETT and ROSSI.

619.    State Defendants failed to intervene on Plaintiff's behalf in order to prevent the violation of Plaintiff's constitutional rights despite State Defendants awareness that Plaintiff's rights were being violated.

620.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of State Defendants' official duties and authority.

621.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

622.    By reason of the foregoing, State Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## FIFTH CAUSE OF ACTION

### (42 U.S.C. § 1983; Unlawful Seizure of Plaintiff's Phone; Under the Fourth and Fourteenth Amendments; Against Defendant Barry)

623.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

624.    Plaintiff advances this claim against Defendant BARRY.

625.    Defendant BARRY, acting without proper justification, effectuated a policy change that called for the Court Officers to confiscate the recording devices of both Plaintiff and

Leibovitz each and every time they entered the Courthouse, despite the fact that neither Plaintiff nor Leibovitz had been convicted of any offense involving the use of such a device. This action was in blatant discriminatory violation of both Plaintiff and Leibovitz' freedom of speech rights under the First Amendment and a further violation of their rights to due process under the Fourteenth Amendment. Defendant BARRY committed the foregoing violations knowingly, intentionally, indiscriminately, willfully, recklessly and with deliberate indifference to the effect of such misconduct upon Plaintiff's constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

626.    Defendant BARRY effectuated said policy under pretense and color of state law and in his individual and official capacity and within the scope of his employment as deputy clerk of the county, Queens Civil Court.  Defendant BARRY's act was beyond the scope of his jurisdiction, without authority of law, and in abuse of his power.

627.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendant BARRY's official duties and authority.

628.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

629.    As a result of Defendant BARRY's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and physical harm.  Accordingly, the Plaintiff demands judgment against Defendant BARRY in a sum of money to be determined at trial.

630.    By reason of the foregoing, Defendant BARRY is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SIXTH CAUSE OF ACTION

(False Imprisonment and Arrest under New York State Law;
Against Defendants Lowe, Rossi and Bennett)

631.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

632.   Plaintiff advances this claim against Defendants LOWE, ROSSI and BENNETT.

633.   As a result of the aforesaid conduct by Defendants LOWE, ROSSI and BENNETT, the Plaintiff was unlawfully detained and confined.  Defendants LOWE, ROSSI and BENNETT in performance of their duties with powers and authorities designated upon them by the State of New York —— intentionally confined Mr. Ward.

634.   Plaintiff was at all times consciously aware of his confinement by Defendants LOWE, ROSSI and BENNETT.

635.   At no point throughout Plaintiff's unlawful detention and confinement by Defendants LOWE, ROSSI and BENNETT did the Plaintiff consent to said confinement.

636.   At no point throughout Plaintiff's unlawful detention and confinement by Defendants LOWE, ROSSI and BENNETT were the actions of Defendants LOWE, ROSSI and BENNETT otherwise privileged.

637.   As a result of Defendants LOWE, ROSSI and BENNETT impermissible conduct, Plaintiff was injured and suffered severe emotional distress and physical harm. Accordingly, Plaintiff demands judgment against Defendants LOWE, ROSSI and BENNETT in a sum of money to be determined at trial.

## SEVENTH CAUSE OF ACTION

(Malicious Prosecution under State Law;
Against Defendants Herring, Piscionere, Scotto, Lowe, Rossi and Bennett)

638.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

639.   Plaintiff advances this claim against Defendants HERRING, PISCIONERE, SCOTTO, LOWE, ROSSI and BENNETT.

640.   By virtue of the foregoing, Defendants HERRING, PISCIONERE, SCOTTO, LOWE, ROSSI and BENNETT initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

641.   The criminal proceeding terminated in Plaintiff's favor on June 10th, 2015 after a bench trial.

642.   There was no probable cause for the commencement or the continuation of the criminal proceedings.

643.   Defendants HERRING, PISCIONERE, SCOTTO, LOWE, ROSSI and BENNETT acted with actual malice.

644.   As a result of Defendants HERRING, PISCIONERE, SCOTTO, LOWE, ROSSI and BENNETT impermissible conduct, Plaintiff was injured and harmed.

645.   Accordingly, Plaintiff demands judgment against Defendants HERRING, PISCIONERE, SCOTTO, LOWE, ROSSI and BENNETT in a sum of money to be determined at trial.

## EIGHTH CAUSE OF ACTION

(Assault and Battery under New York State Law;
Against Defendant Cannon)

646.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

647.   Plaintiff advances this claim against Defendant CANNON.

648.   Defendant CANNON committed battery upon the Plaintiff  in his act of making bodily contact with the Plaintiff , causing him physical abuse, debasement and humiliation at a time when he had not been detained or arrested and without any probable cause.

649.   Defendant CANNON performed his acts of making bodily contact with the Plaintiff with the intent to do so.

650.   Defendant CANNON acts of making bodily contact with the Plaintiff were subjectively offensive in nature to the Plaintiff.

651.   Defendant CANNON acts of making bodily contact with the Plaintiff would be objectively offensive in nature to a reasonable person aware of the circumstances of Plaintiff's arrest.

652.   Defendant CANNON performed these acts of making bodily contact with the Plaintiff without privilege or consent from the Plaintiff.

653.   As a result of Defendant CANNON's conduct, the Plaintiff suffered emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, damage to his reputation and standings within his community and legal hours of work to defend himself from the baseless charge.

654.   As a result of Defendant CANNON's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and physical harm.   Accordingly, the Plaintiff

demands judgment against Defendant CANNON in a sum of money to be determined at trial.

## NINETH CAUSE OF ACTION

(Assault under New York State Law;
Against Defendant Bennett)

655.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

656.    Plaintiff advances this claim against Defendant BENNETT.

657.    Defendant BENNETT committed assault upon the Plaintiff in her act of threatening to place Plaintiff and Leibovitz in handcuffs, despite the fact that she had no probable cause to do so. This caused Plaintiff physical abuse, debasement, humiliation and emotional distress, at a time when he had not been detained or arrested.

658.    Defendant BENNETT performed the act of committing verbal assault against the Plaintiff with the intent to do so.

659.    Defendant BENNETT performed the act of committing verbal assault against the Plaintiff which was subjectively offensive in nature to the Plaintiff.

660.    Defendant BENNETT's act of committing verbal assault against the Plaintiff would be objectively offensive in nature to a reasonable person aware of the circumstance.

661.    Defendant BENNETT performed the act of committing verbal assault against the Plaintiff without privilege or consent from the Plaintiff.

662.    As a result of Defendant BENNETT's conduct, the Plaintiff suffered emotional distress, anguish, anxiety, fear and humiliation.

663.    As a result of Defendant BENNETT's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and physical harm.   Accordingly, the Plaintiff demands judgment against Defendant BENNETT in a sum of money to be determined at trial.

## TENTH CAUSE OF ACTION

(Assault and Battery under New York State Law;
Against Defendants Lowe, Rossi and Bennett)

664.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

665.    Plaintiff advances this claim against Defendants LOWE, ROSSI and BENNETT.

666.    Defendants LOWE, ROSSI and BENNETT committed battery upon the Plaintiff in their acts of making bodily contact with the Plaintiff by handcuffing him in the absence of probable cause to arrest.

667.    Defendants LOWE, ROSSI and BENNETT performed these acts of making bodily contact with the Plaintiff with the intent to do so.

668.    Defendants LOWE, ROSSI and BENNETT acts of making bodily contact with the Plaintiff were subjectively offensive in nature to the Plaintiff.

669.    Defendants LOWE, ROSSI and BENNETT acts of making bodily contact with the Plaintiff would be objectively offensive in nature to a reasonable person aware of the circumstances of Plaintiff's arrest.

670.    Defendants LOWE, ROSSI  and BENNETT performed these acts of making bodily

contact with the Plaintiff without privilege or consent from the Plaintiff.

671.    As a result of Defendants LOWE, ROSSI and BENNETT's conduct the Plaintiff suffered emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, damage to his reputation and standings within his community and hours of legal work to defend himself from the baseless charge.

672.    As a result of Defendants LOWE, ROSSI and BENNETT's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and harm. Accordingly, the Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## ELEVENTH CAUSE OF ACTION

(Sexual Discrimination under New York State Law;
Against Defendant Bennett)

673.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

674.    Plaintiff advances this claim against Defendant BENNETT, who acted with impermissible and unlawful bias in demonstrating blatant preference to Teresa Ward, while acting in a harassing and abusive manner to Plaintiff.

675.    As a result of Defendant BENNETT's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and harm. Accordingly, the Plaintiff demands judgment against Defendant in a sum of money to be determined at trial.

## TWELFTH CAUSE OF ACTION

(Unjust Confinement under New York State Law;
Against Defendants Bennett and Lowe)

676.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

677.    Plaintiff advances this claim against Defendants BENNETT and LOWE.

678.    Defendants BENNETT and LOWE, with malicious intent, confined Plaintiff and Leibovitz in Queens Civil Court holding cells, and subsequently in Rikers Island prison, without appropriate justification. Both Plaintiff and Leibovitz were initially informed that they would be issued appearance tickets or a summons. They suffered from and were completely aware of their confinement, which lasted for hours for both Leibovitz and Plaintiff.

679.    As a result of Defendants LOWE and BENNETT's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and harm. Accordingly, the Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

(42 U.S.C. § 1983/ Fourth and Fourteenth Amendments;
Against Defendant Diaquoi)

680.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

681.   Plaintiff advances this claim against Defendant DIAQUOI.

682.   By reason of the foregoing, and by arresting Plaintiff without probable cause, Defendant DIAQUOI deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States and secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution to be free from false arrest and false imprisonment.

683.   By reason of the foregoing, Defendant DIAQUOI, acting intentionally, maliciously, and without justification or probable cause, caused accusatory instruments to be filed and otherwise brought criminal charges against Plaintiff, who was held in Department of Correction's custody on charges that were ultimately dismissed by the Queens County District Attorney's Office. Defendant DIAQUOI took said actions despite the fact that he possessed credible evidence that the charges presented to him by Teresa Ward were totally unreliable and without foundation. Defendant Diaquoi further exacerbated the matter by failing to maintain the proper factual evidence.

684.   The wrongful, unjustifiable, and unlawful apprehensions, arrests, detentions and imprisonment of Plaintiff were carried out without a valid bench warrant, without a valid misdemeanor warrant, without his consent, and without probable cause or reasonable suspicion.   Defendant DIAQUOI's procurement of an I-Card was totally unsupported by the facts already available at his disposal, nor did he investigate any of Teresa Ward's disputed and unsubstantiated claims against the Plaintiff. When Plaintiff attempted to discuss the false allegations with Defendant DIAQUOI, the Defendant refused to discuss same and terminated the conversation.

685.   The forcible stop, arrest, detention and imprisonment, Defendant DIAQUOI, acted under pretense and color of state law and in his individual and official capacity and within the scope of his employment as a detective for the New York City Police Department.   Defendant DIAQUOI's acts were beyond the scope of his jurisdiction, without authority of law, and in abuse of his power. This defendant acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth

an Fourteenth Amendments to the United States Constitution

686. As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

687. As a result of Defendant DIAQUOI's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and harm. By reason of the foregoing, Defendant DIAQUOI is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## FOURTEENTH CAUSE OF ACTION

(42 U.S.C. § 1983; Denial of Due Process
Under the Fifth and Fourteenth Amendments;
Malicious Prosecution, Deprivation of Liberty, Subornation of Perjury,
Spoliation of Evidence, Conspiracy
Under the Fourth, Fifth, Sixth and Fourteenth Amendments;
Against Defendants Diaquoi. Staines and Harper)

688. Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

689. Plaintiff advances this claim against Defendants DIAQUOI, STAINES and HARPER.

690. Defendants DIAQUOI, STAINES and HARPER working in concert with Teresa Ward, knowingly and willingly manufactured  false and fraudulent allegations, subsequently converted to charges,  with the objective of procuring an unlawful conviction of Plaintiff.

691. These illegal and unconstitutional means included, but were not limited to,

a) Abusing judicial process by causing Teresa Ward to deliberately provide false and misleading testimony in the form of an affidavit in order to try and justify an unlawful arrest and confinement;

b) Defendant HARPER attempted to influence Plaintiff to attest to a report prepared by a police officer that included false and fraudulent allegations. This constituted a blatant attempt to suborn perjured testimony.

c) Colluding with each other to suborn false and perjured testimony from Teresa Ward;

d) Colluding with each other to spoliate critical material that would have acted as exculpatory evidence, in order to falsely and unlawfully procure a conviction;

e) Deliberately withholding and concealing Brady and Rosario material;

f) Defendant DIAQUOI failed to investigate any of the allegations made by Teresa Ward, despite receiving convincing evidence of its lack of credibility from Plaintiff.

g) Defendant DIAQUOI further procured an I-Card that led to Plaintiff's unlawful arrest, despite already being in possession of exculpatory evidence that absolutely cleared Plaintiff of any wrongdoing.

692.    These lawless actions foreseeably caused Teresa Ward to manufacture false evidence which Defendants DIAQUOI, STAINES and HARPER then used to continue Plaintiff's malicious prosecution, without probable cause.

693.    The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

a. Not to be arrested, prosecuted, detained, based on false, fabricated, manufactured and misleading statements in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution;

b. Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth, Sixth and Fourteenth Amendments to the United States Constitution; and

c. To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

694.   The foregoing violations of Plaintiff's federal constitutional rights by the Defendants caused the initiation and continuation of Plaintiff's malicious prosecution without probable cause,  his loss of liberty and detention, with bail set at  $1,000 and other injuries and damages.

695.   The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants' official duties and authority.

696.   Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently and with deliberate indifference to Plaintiff's constitutional rights to or to the effect of such misconduct upon Plaintiff's constitutional rights.

697.   By reason of the foregoing, Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## FIFTEENTH CAUSE OF ACTION

(False Imprisonment and Arrest under New York State Law;
Against Defendant Diaquoi)

698.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

699.   Plaintiff advances this claim against Defendant DIAQUOI.

700.   As a result of the aforesaid conduct by Defendant DIAQUOI, the Plaintiff was unlawfully detained and confined.  Defendant DIAQUOI in performance of his duty with powers and authorities designated upon him by the State of New York —— intentionally confined Mr.

Ward.

701.   Plaintiff was at all times consciously aware of his confinement by Defendant DIAQUOI.

702.   At no point throughout Plaintiff's unlawful detention and confinement by Defendant DIAQUOI did the Plaintiff consent to said confinement.

703.   At no point throughout Plaintiff's unlawful detention and confinement by Defendant DIAQUOI were the actions of Defendant DIAQUOI otherwise privileged.

704.   As a result of Defendant DIAQUOI's impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendant DIAQUOI in a sum of money to be determined at trial.


## SIXTEENTH CAUSE OF ACTION

(Malicious Prosecution under State Law;
Against Defendant Staines, Harper and Diaquoi)

---

705.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

706.   Plaintiff advances this claim against Defendants STAINES, HARPER and DIAQUOI.

707.   By virtue of the foregoing, Defendants DIAQUOI, HARPER and STAINES initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

708.   The criminal proceeding terminated in Plaintiff's favor on October 30th, 2015.

112

709.   There was no probable cause for the commencement or the continuation of the criminal proceedings.

710.   Defendants STAINES, HARPER and DIAQUOI acted with actual malice.

711.   As a result of Defendants STAINES, HARPER and DIAQUOI impermissible conduct, Plaintiff was injured and harmed.

712.   Accordingly, Plaintiff demands judgment against Defendants STAINES, HARPER and DIAQUOI in a sum of money to be determined at trial.


## SEVENTEENTH CAUSE OF ACTION

(Assault and Battery under New York State Law;
Against Defendant Diaquoi)

713.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

714.   Plaintiff advances this claim against Defendant DIAQUOI.

715.   Defendant DIAQUOI committed battery upon the Plaintiff by virtue of his procurement of the I-card that resulted in Plaintiff, who had already been arrested, suffering through the harassment and humiliation of being photographed and fingerprinted a second time.

716.   Defendant DIAQUOI performed the act of procuring the I-card, despite possessing credible evidence that it was not justified, resulting in unnecessary abuse to the Plaintiff, with the intent to do so.

717.   Defendant DIAQUOI's act of procuring the I-card against the Plaintiff was subjectively

offensive in nature to the Plaintiff.

718.    Defendant DIAQUOI's act of procuring the I-card against  the Plaintiff would be objectively offensive in nature to a reasonable person aware of the credible evidence available that supported Plaintiff's total innocence of the allegations made by Teresa Ward.

719.    Defendant DIAQUOI performed the act of procuring the I-card against  the Plaintiff without privilege or consent from the Plaintiff.

720.    As a result of Defendant DIAQUOI's conduct the Plaintiff suffered emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, damage to his reputation and standing within his community and  hours of legal work to defend himself from the baseless charge.

721.    As a result of Defendant DIAQUOI's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and  harm. Accordingly, the Plaintiff demands judgment against Defendant DIAQUOI in a sum of money to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION

(Unjust Confinement under New York State Law;
Against Defendant Diaquoi)

722.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

723.    Plaintiff advances this claim against Defendant DIAQUOI.

724.    The action of Defendant DIAQUOI, in procuring an unjustified I-card, resulted in  the confinement of  Plaintiff in holding cells at the 103rd Precinct, and subsequently in Rikers Island prison, with malicious intent and without appropriate justification.  He suffered from

and was completely aware of his confinement, which lasted for hours.

725.    As a result of Defendant DIAQUOI's impermissible conduct, the Plaintiff was injured and suffered severe emotional distress and harm. Accordingly, the Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## NINETEENTH CAUSE OF ACTION

### MUNICIPAL LIABILITY UNDER MONELL ARISING FROM UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. §1983
(Against the City of New York)

726.    Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

727.    Defendant THE CITY OF NEW YORK directly caused the constitutional violations suffered by the Plaintiff, and is liable for the damages suffered by the Plaintiff as a result of the conduct of Defendants BROWN and HERRING.    The conduct of  BROWN and HERRING was a direct consequence of policies and practices of Defendant CITY.

728.    At all times relevant to this complaint Defendant CITY, acting through QDAO,  had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of engaging in indiscriminate changes in policy, often without rhyme or reason, and then applying them on an ex-post facto manner. Defendants HERRING and BROWN collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States. Defendant BROWN and HERRING   were a direct and proximate cause of the

damages and injuries complained of herein

## THE CITY OF NEW YORK HAS A POLICY TO INDISCRIMINATELY MAKE CHANGES IN RULES AND REGULATIONS WITHOUT SUFFICIENT BASIS OR EXPLANATION, AND THEN APPLY THEM IN AN EX-POST FACTO MANNER

729.   Defendant SCOTTO quite obviously suborned what he should have known to be perjured testimony by Defendant BENNETT as he had continuous access to the Courtroom recording in the months leading up to the trial, and specifically stated during testimony that *"And we were directed not to provide that"* after Leibovitz and Mr. Ward repeatedly requested the Courtroom recording as part of discovery. His objection that this represented "trial by ambush" was a poorly disguised attempt to cover-up his misjudgment as to what Leibovitz and Mr. Ward might be able to bring to the Court as clear evidence of misconduct, having gambled incorrectly that he and Defendant BENNETT would not be caught in the act of committing and suborning perjured testimony. The origin of this activity can be traced directly back to higher-ups in the QDAO, such as Defendant HERRING, who are responsible for setting office policy. That establishes this unlawful behavior as a Monell violation.

730.   Defendant CITY caused Plaintiff to be subjected to First, Fourth, Fifth, Sixth and Fourteenth Amendment violations because Defendants BROWN and HERRING's actions were part of the customary practices of QDAO.

731.   Additionally, Defendant CITY knew or should have known, more specifically that the QDAO has a propensity to engage in indiscriminate changes in policy aimed at making unlawful conduct that was within an individual's rights at the time the incident occurred. This form of misconduct runs rampant in the QDAO. Defendant CITY was aware of numerous claims of constitutional violations, as documented in the following

116

a)  National District Attorney's Association: A Report of the Prosecution Performance Measurement Project [2]
b)  New York Court of Appeals Holds that Criminal Defendants Bringing Rosario Claims by Way of CPL § 440.10 must demonstrate that PEOPLE 's failure to deliver Rosario materials constituted actual prejudice [3]
c)  New York Times article titled- Misconduct by Prosecutors, Once Again [4]
d)  In the summer of 2012, Marvin Schechter, a defense lawyer and chairman of the criminal justice section of the New York State Bar Association, stated that prosecutorial misconduct stood revealed not as a trickle but as a polluted river. [5]
e)  New York Times article titled- Freed Man's Suit Accuses Brooklyn Prosecutors of Misconduct [6]

732.   Despite its knowledge of such incidents of prior misconduct, Defendant CITY failed to take remedial action.

733.   It was the policy and/ or custom of Defendant CITY to inadequately and improperly investigate defendant complaints of prosecutorial misconduct and acts of misconduct were instead tolerated by Defendant CITY, including, but not limited to, the incidents listed above.

734.   As a result of the above described policies and customs, District Attorneys and Assistant District Attorneys of the CITY OF NEW YORK, including Defendant BROWN and HERRING, believed that their actions would be not investigated or sanctioned, but would be tolerated.

735.   The wrongful policies, practices, customs and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the CITY OF NEW YORK to the constitutional rights of person within the city, and were the direct and proximate cause of the violations of Plaintiff's rights alleged herein.

[2] http://www.ndaa.org/pdf/do_lower_conviction_rates_07.pdf
[3] http://scholarship.law.stjohns.edu/cgi/viewcontent.cgi?article=1812&context=lawreview
[4] http://www.nytimes.com/2012/08/14/nyregion/new-charge-of-prosecutorial-misconduct-in-queens.html?_r=0
[5] http://nylawyer.nylj.com/adgifs/decisions/073012schechter.pdf
[6] http://www.nytimes.com/2011/02/17/nyregion/17brooklyn.html

117

736.   As a result of Defendant CITY's impermissible conduct, the Plaintiff was injured and harmed. Accordingly, the Plaintiff demands judgment against Defendant CITY in a sum of money to be determined at trial.

## TWENTIETH CAUSE OF ACTION

### *RESPONDEAT SUPERIOR* LIABITLITY
### CITY OF NEW YORK
### FOR STATE LAW VIOLATIONS
### COMMON LAW CLAIM

737.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

738.   "City Employees" that participated in detaining and arresting the Plaintiff, and who committed the other wrongs against the Plaintiff described herein, whether named individual herein or not, were employees of Defendant CITY at all relevant times, Defendants BROWN, HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI, were acting within the scope of their employment and on behalf of Defendant CITY.

739.   Defendant CITY is responsible for the torts of Defendants BROWN, HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI and for the consequences of their actions generally, under the theory of common law doctrine of *respondeat superior*.

740.   As a result of Defendants BROWN, HERRING, SCOTTO, PISCIONERE, HARPER, STAINES, DIAQUOI and Defendant CITY's impermissible conduct, the Plaintiff was injured and harmed. Accordingly, the Plaintiff demands judgment against Defendant CITY in

a sum of money to be determined at trial.

## TWENTY – FIRST CAUSE OF ACTION

### NEGLIGENCE UNDER NEW YORK STATE LAW
NEGLIGENT HIRING, TRAINING, DISCIPLINE, SUPERVISION, RETENTION AND
TRAINING AGAINST DEFENDANT CITY

741.   Plaintiff repeats, reiterates, and re-alleges each and every averment contained in the above paragraphs with the same force and effect as if fully set forth herein.

742.   Defendant CITY, through Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI, owed a duty of care to Mr. Ward to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to Mr. Ward or to those in a like situation would probably result from the foregoing conduct.

743.   Defendant CITY was negligent in the hiring and retention of Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI as follows:

> A. Upon information and belief, Defendant CITY failed to use reasonable care in the hiring and retention of Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI who conducted and participated in the acts of subjecting Mr. Ward to assault and battery, false arrest, imprisonment, malicious prosecution, and violations of his constitutional rights in the manners described herein.

> B. Defendant CITY knew, or should have known in the exercise of reasonable care, the propensities of the aforesaid Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI to engage in the wrongful conduct heretofore alleged in this claim.

744.    Defendant CITY was negligent in the training and supervision of Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI as follows:

    A. Defendant CITY knew or should have known that the requirements, guidelines, and terms of its training for Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI were insufficient and inadequate to prevent Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI from engaging in the wrongful conduct heretofore alleged.

745.    Defendant CITY is also liable to Mr. Ward on the basis of *respondeat superior* as a result of the constitutionally-impermissible actions of Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES and DIAQUOI as described herein.

746.    As a result of Defendants HERRING, SCOTTO, PISCIONERE, HARPER, STAINES, DIAQUOI and Defendant CITY's impermissible conduct, Mr. Ward  was injured and harmed. Accordingly, Mr. Ward demands judgment against Defendant CITY in a sum of money to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief jointly and severally against Defendants:

## DECLARATORY RELIEF

A.  Issue a declaratory judgment that Defendant Barry's discriminatory policy to confiscate Plaintiff's phone each and every time he enters Queens Civil Court be declared unconstitutional and a violation of Plaintiff's First Amendment right to free speech and Fourth Amendment protection against illegal search and seizure.

B.  Defendants Brown, City of New York, Piscionere, Herring, Staines, Barry, Lowe, Rossi, Harper, Diaquoi, Scotto, Bennett and State Defendant's actions were a denial of Kenneth J. Ward Jr.'s Due Process rights under the 1st, 4th, 5th, 6th and 14th Amendment to the United States Constitution.

C.  Issue a declaratory judgment that Defendants Brown, City of New York, Piscionere, Scotto, Herring, Harper, Staines, Barry, Lowe, Diaquoi, Rossi and Bennett's actions were abuse of process and malicious prosecution, and deprivation of Kenneth J. Ward Jr.'s liberty rights under the 4th, 5th, 6th and 14th Amendment to the United States Constitution.

## INJUNCTIVE RELIEF

D.  Enjoin Defendant Barry and his successor, agents, servants, employees and all of those in active concert or participation with him from subjecting plaintiff to unlawful search and seizure in violation of protections provided under the Fourth Amendment of the U.S. Constitution.

E.   Brown and Herring and their successors, agents, servants, employees and all of those in active concert or participation with them from subjecting defendants to unlawful criminal prosecution and constitutional due process violations.

F.  Retain jurisdiction of this case until Defendants have fully complied with the orders of the Court, the unlawful conditions, practices, policies, acts, and omissions complained of herein, no longer exist and this court is satisfied that they will not recur.

## DEMAND FOR MONETARY DAMAGES

1. Award Plaintiff compensatory damages in the amount of $25,000,000;
2. Award Punitive damages against the individual defendants in an amount $25,000,000  based on the wanton, willful and gross misconduct of the defendants to deter similar conduct;
3. Plaintiff demands a jury trial with respect to all claims which may be so tried.
4. Award Plaintiff reasonable legal and financial consulting fees and interest;
5. Award such other and further relief as the Court deems just and proper.

Dated: Queens, New York
April 15th, 2017

Kenneth J. Ward Jr
8443 64th Road Apt 47B
Middle Village, NY 11385
(212) 470-2889

**Statement of Verification**

Kenneth J. Ward Jr, being duly sworn deposes and says:

I am the plaintiff in the above-entitled action.  I have read the foregoing amended verified complaint and know the contents thereof.  The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

4-15-17

Kenneth J. Ward Jr.,  Plaintiff

Sworn to before me this

15th day of April, 2017

NOTARY PUBLIC

JHUMA ROY
Notary Public - State of New York
NO. 01RO6154572
Qualified in Queens County
My Commission Expires 10/23/18